636 So.2d 310 (1992)
GENERAL MOTORS CORPORATION
v.
Linda JACKSON, Individually and Next Friend and Natural Guardian of Her Minor Daughter Amanda Jackson and Terry Jackson.
No. 90-CA-0824.
Supreme Court of Mississippi.
December 3, 1992.
Opinion Denying Rehearing April 21, 1994.
Mandate Stayed May 13, 1994.
Opinion Dissenting in Part from May 13, 1994.
Order Staying Mandate Filed June 23, 1994.
W. Swan Yerger, Gene D. Berry, Heidelberg & Woodliff, Jackson, John R. Reese, David M. Heilborn, McCutchen Doyle Brown & Enersen, San Francisco, CA, Chilton D. Varner, Atlanta, GA, for appellant.
David D. O'Donnell, S. Duke Goza, H. Scot Spragins, Benjamin H. Sanders, Hickman Goza & Gore, Oxford, S.T. Rayburn, Mitchell McNutt Threadgill Smith & Sams, David G. Hill, Maurie L. White, Craig Hill White & Minyard, Oxford, J. Max Kilpatrick, Philadelphia, for appellee.
Before HAWKINS, P.J., and SULLIVAN and McRAE, JJ.
En Banc.
Affirmed.

ON PETITION FOR REHEARING
McRAE, Justice, for the Court:
On petition for rehearing, we reconsider General Motors Corporation's appeal from a *311 jury finding that the fracture of a defective rear axle in a 1984 GMC Jimmy was the proximate cause of serious and permanent injuries suffered by Linda Jackson and her daughter, Amanda, in a December 14, 1984, single-vehicle accident. Terry Jackson further sustained loss of companionship with his wife and daughter. Following a ten-day trial in the Leake County Circuit Court, the jury awarded the Jacksons $7.15 million in compensatory damages. On December 1, 1992, a three-judge panel of this Court heard oral arguments on the case. Finding that the manufacturer's arguments were without merit and presented no novel questions of law, we affirmed the decision per curiam. General Motors filed its petition for rehearing in January, 1993. The corporation raised many of the same assignments of error cited in its original appeal and requested that we issue a written opinion. Pursuant to Miss.Sup.Ct. Rule 35, this Court is required to publish a written opinion when to do so will add to the value of our jurisprudence. When this Court originally reviewed this case, we found that it presented no novel or distinctive issues of law or fact. In such cases, we long have held that we are not obligated to publish a written opinion. Morea v. State, 329 So.2d 527, 527-528 (Miss. 1976); Duncan v. Perkins, 192 So.2d 386 (Miss. 1966); Batson v. Draughon, 11 So.2d 203 (Miss. 1942); Yazoo & Mississippi Valley Railroad Co. v. James, 108 Miss. 852, 67 So. 484 (1914).
After a careful reconsideration of the record, we deny General Motors' petition for rehearing.[1] We do, however, take this opportunity to discuss whether evidence obtained in contravention of M.R.C.P. 26(b)(4)(B) by deposing an expert witness, designated and later dismissed by one party, is admissible at trial. We further discuss whether the trial judge properly excluded the evidence under M.R.E. 403 and ultimately, whether the parties received a fair trial.

I.
On December 14, 1984, Linda Jackson and her six-week-old daughter, Amanda, were injured in a one car accident in Leake County, Mississippi. Linda was driving the family's 2.8 liter V-6 GMC Jimmy 4X4, which was designed and manufactured by General Motors Corporation in September, 1983. The Jacksons contend that the crash was caused by the fracture of a defective left rear axle which caused her to lose control of the vehicle; General Motors, on the other hand, asserts that the axle broke on impact.
At the time of the accident, Linda was travelling at a speed of approximately fifty to sixty miles per hour. She testified that she felt a bump or jarring in the left rear end of the vehicle. She glanced at Amanda, who was secured in her car seat on the passenger side of the vehicle, to see if she had been disturbed. Within a few seconds, the Jimmy veered to the left, out of control. The vehicle flipped three times, coming to rest near a pond. Its left rear wheel was found some twelve to fourteen feet away. At the accident scene, Linda, in great pain and near death, described the bump to witnesses as a "sensation on the left side of my vehicle like you had run off the road," and stated that she no longer had any control over her vehicle.

II.
The left rear axle of the Jackson's vehicle fractured at the flange end, where the wheel is attached to the axle shaft. The damaged axle is distinguished by a white circle painted around the flange. This indicates that this particular axle shaft initially failed to meet General Motors' specifications and was put through the induction hardening process a second time or "retoccoed."
The axle was designed by General Motors and manufactured at its Saginaw-Buffalo plant in Buffalo, New York. Raw unmachined shafts made of SAE 1050 modified steel were purchased from the Saginaw-Tonawanda Forge Plant. At the General Motors plant, the parts were partially machined, induction hardened, machine finished and put *312 into the rear axle assembly. Manufacture of each axle costs approximately fourteen dollars.
At the Saginaw-Buffalo Plant, the raw axle shaft is put through a two-part heat induction process to make it hard on the outside but flexible. First the shafts are heated in the tocco unit and then, in the quench process, sprayed with water to harden the steel. Inside the tocco unit, the axle shaft is heated to a temperature of approximately 1750 degrees Fahrenheit. However, the unit is not equipped with gauges or other systems for monitoring the temperature of either the heating unit or the quench water. Whether the axle shaft has reached the proper temperature and hardness is determined largely by appearance.
After the shafts have been through the tocco unit, random samples from each work station are tested by an eddy current machine to determine whether the case depth specification has been met. Samples are also given a "file test" to make sure that the quench water has not become overheated. Any shafts which fail the eddy current test are retoccoed, that is, run through the heat induction hardening process again. General Motors maintains that the retocco process brings the shafts up to its case depth and hardness specifications.
After the tocco process and inspections, the axle shafts are placed in a tempering furnace to relieve quench stress. Again, the shafts are subjected at random to a series of inspections. They are ultrasound tested for internal defects such as chevrons or cracks. General Motors' witnesses testified that all axle shafts are so tested. However, the plaintiff's witness, the Saginaw-Buffalo plant lab supervisor at the time the Jacksons' axle shaft was manufactured, testified that in 1983, the retoccoed axles were not ultrasound tested because they had a 100% failure rate since the retocco process changes the nature of the steel. Further, evidence was presented that ultrasonic testing begins at the button end of the axle, but does not extend to the flange end where the Jacksons' axle fractured.

III.
As a result of the accident, Amanda suffered profound brain damage. At the age of five, test results indicated that her I.Q. was below 35, approximating the mental age of a twenty-two month old. A hydrocephalic condition which developed several days after the accident rendered her permanently shunt-dependent, requiring the maintenance of a lumbar peritoneal shunt to relieve the pressure on her brain and dispose of excess spinal fluid. Constant medication is required to control seizure activity. As a result of damage to the occipital lobe of her brain, Amanda also suffers visual, speech and motor control impairments.
Linda sustained multiple injuries, most notably, severe hip and pelvic damage, rendering her incapable of sustaining a pregnancy to term. Ultimately, it was necessary to perform a tubal ligation. Further, there is evidence that Linda also sustained closed brain injuries and that she suffers from severe psychological problems as result of the accident. These injuries, as well as the burden of caring for Amanda, has resulted in a serious loss of companionship and conjugal rights to Linda's husband, Terry.

IV.
The Jacksons filed a complaint against General Motors, a Delaware corporation, and Grenada Sales Company, Inc., a Mississippi corporation, in the Leake County Circuit Court on November 8, 1985. They alleged that General Motors and Grenada Sales were strictly liable on the theory of products liability, and that the defendants breached express and implied warranties of merchantability and fitness. Seeking both compensatory and punitive damages, they further charged that General Motors was negligent, reckless and wanton in the manufacture, tempering and testing of the rear axle of the vehicle.
After the defendants' unsuccessful attempt to remove the case to federal court, there ensued four years of discovery. The parties focused on developing expert opinions in support of their conflicting theories of axle failure: the Jacksons' assertion that the accident was caused by a stress fracture in the *313 rear axle and General Motors' argument that the impact of the accident caused the axle to fracture.
The pretrial battle of the experts appeared to reach a crescendo in 1989, when John Marcosky, an expert in the field of accident reconstruction retained by the Jacksons, communicated to their attorneys that he believed that the axle did not fracture prior to the accident. The attorneys had responded through interrogatories that Marcosky was expected to testify that the crash was caused by a defective rear axle. Much later in the discovery process, Marcosky presented an opinion similar to that espoused by General Motors' experts, adding that he believed the axle broke in mid-air during the rollover. The attorneys filed supplemental responses withdrawing Marcosky as a potential expert, and withdrew as counsel for the Jacksons.
At trial, General Motors' two experts in the fields of accident reconstruction and metallurgy, as well as various employees in the laboratory and quality control areas, testified that the axle was not defective and broke on impact. The Jacksons' experts presented evidence that the axle was defective and further, that the accident was caused by a stress fracture in the axle. General Motors presented no experts to contradict any of the Jacksons' witnesses on the issue of damages.
After ten days of testimony, the jury returned a general verdict against General Motors, but in favor of Grenada Sales. It awarded Amanda Jackson damages in the amount of $5 million; Linda Jackson, $2 million, and Terry Jackson, $150,000.00 for loss of consortium. Judgment was entered on June 11, 1990.

V.
General Motors contends that the jury verdict and damages are against the weight of the evidence, that the circuit court erred in the admission and exclusion of certain evidence, and that the circuit judge made comments prejudicial to the manufacturer. Having carefully reviewed the twenty-four volume record and accompanying exhibits, we find that General Motors' assignments of error are without merit. As with any lengthy trial, this may not have been a perfect trial. However, it was a fair trial. The circuit judge was fair and even-handed throughout the proceedings. Our review of the 2,094 page trial transcript indicates that, if anything, the circuit court "bent over backwards" to accommodate General Motors and its witnesses. On direct examination, experts were allowed to indulge in long, uninterrupted narratives. They were even permitted to re-examine, measure and test evidence on two occasions during the trial. Moreover, throughout the trial, when counsel would allude to earlier testimony, the circuit judge admonished the members of the jury to remember that they, not the court or the attorneys, were the finders of fact, and to rely on their own recollections of the evidence presented.

VI.
General Motors' contention that the circuit court erred in striking the designation and testimony of John Marcosky as an expert witness for Grenada Sales provides us with an opportunity to address the application of M.R.C.P. 26(b)(4)(B). In December, 1988, Marcosky, who had been retained by the Jacksons as an expert in 1987, communicated to their attorneys that based on his examination of the damaged rear wheel-axle assembly and the manner in which the flange end was bent, he had concluded that the axle shaft did not fail prior to impact. Consequently, in January, 1989, the Jacksons supplemented their interrogatories and withdrew Marcosky as a potential expert. On May 30, 1989, Grenada Sales noticed Marcosky's deposition. The Jacksons concurrently sought a protective order, asserting that deposition of Marcosky, as well as Grenada Sales' request for his files, was improper and beyond the scope of discovery allowed by M.R.C.P. 26(b)(4)(B). The circuit court overruled the Jacksons' motion and authorized Grenada Sales to depose Marcosky, but reserved for trial his ruling on its admissibility. After the June 12, 1989 deposition, Grenada Sales designated Marcosky as an expert witness. The Jacksons filed a motion to strike the designation and to exclude his testimony. Applying a literal interpretation of Rule 26(b)(4)(B), the circuit court found "that expert, *314 John Marcosky, should not have been allowed by this Court to have been deposed in the first instance and should not be allowed to testify in this cause."
We find that the circuit court properly acknowledged its error in allowing Grenada Sales to depose Marcosky prior to trial and agree that he should not have been allowed to testify. Rule 26(b)(4)(B) clearly limits the extent to which a party may discover the opinions or facts known by an expert retained by an adverse party but not expected to be called as a witness at trial. The rule provides as follows:
A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.
M.R.C.P. 26(b)(4)(B) (emphasis added). The rule makes no provision for ex parte communication with an expert witness. Rule 26(b)(4)(A)(i) further limits even the discovery of facts known by an expert witness expected to be called at trial, allowing depositions only after interrogatories.
Interpreting the analogous federal rule, courts have found that "[t]he party `seeking disclosure under Rule 26(b)(4)(B) carries a heavy burden' in demonstrating the existence of exceptional circumstances." Ager v. Jane C. Stormont Hospital and Training School for Nurses, 622 F.2d 496, 503 (10th Cir.1980); Hoover v. United States Department of Interior, 611 F.2d 1132, 1142 n. 13 (5th Cir.1980). Neither Grenada Sales nor General Motors presented a showing of exceptional circumstances making it impossible or impractical for them to obtain facts or opinions about the cause of the accident by any other means. Absent such a showing, deposition of an expert retained by a party but not expected to testify is impermissible.
Our discussion does not end with Rule 26(b)(4)(B). The rules of discovery do not address whether the testimony of a nonwitness expert retained or dismissed by a party is admissible at trial. Admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion. Sperry-New Holland v. Prestage, 617 So.2d 248, 260 (Miss. 1993); Hughes v. Tupelo Oil Company, Inc., 510 So.2d 502, 505 (Miss. 1987); Brumley Estate v. Iowa Beef Processors, Inc., 704 F.2d 1351 (5th Cir.1983), cert. denied 465 U.S. 1028, 104 S.Ct. 1288, 79 L.Ed.2d 690 (1984).
Rule 403 of the Mississippi Rules of Evidence provides that evidence, though relevant, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This Court will not "engage anew in the 403 balancing process," rather its scope is limited to determining "whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence." Williams v. State, 543 So.2d 665, 667 (Miss. 1989), quoting Foster v. State, 508 So.2d 1111, 1118 (Miss. 1987). Except for his hypothesis that the axle broke in mid-air during the rollover, Marcosky's theory of the accident was nearly identical to that articulated by General Motors' own experts. It added nothing new to the evidence presented and thus, would have been cumulative. Having found that Marcosky's deposition was obtained in contravention of Rule 26(b)(4)(B), we cannot say that the circuit court erred in refusing to allow his testimony.
As General Motors contends, no privilege exists to bar Marcosky's testimony. Except in those instances where an expert was originally retained in another capacity, a majority of jurisdictions have held that the rules of privilege do not preclude calling an expert witness originally retained by the adverse party. Knoff v. American Crystal Sugar Co., 380 N.W.2d 313, 319-320 (N.D. 1986); Granger v. Wisner, 134 Ariz. 377, 379, 656 P.2d 1238, 1240 (1982). However, in the case sub judice, allowing Marcosky to testify would "create the anomaly that although a party cannot depose an adversary's non-testifying *315 expert, a court can compel the witness to testify at trial." Graham v. Gielchinsky, 126 N.J. 361, 368, 599 A.2d 149, 153 (1991).
Allowing General Motors to call Marcosky as a trial witness and to allude to the fact that he had been retained and later dismissed by the Jacksons would be highly prejudicial. Generally, when an expert formerly retained by a party is allowed to testify for an adverse party, he is restricted from mentioning the prior affiliation. Granger, 134 Ariz. at 381, 656 P.2d at 1242. The Arizona Court found:
[t]he admission of this evidence on direct examination would only serve to unfairly prejudice the plaintiff. Jurors unfamiliar with the role of counsel in adversary proceedings might well assume that plaintiff's counsel had suppressed evidence which he had an obligation to offer. Such a reaction would destroy counsel's credibility in the eyes of the jury.
Granger, 134 Ariz. at 381-382, 656 P.2d at 1242-1243, citing State v. Biggers, 360 S.W.2d 516, 517 (Tex. 1962). Without such safeguards, the resultant prejudice would impede the search for truth.

VII.
The jury awarded compensatory damages in the amount of $5 million to Amanda and $2 million to Linda. Linda's husband, Terry, was awarded $150,000.00 for loss of consortium. General Motors asserts that the $7.15 million award is excessive. However, based on the unrefuted evidence in the record before us, these amounts are neither unreasonable nor outrageous. Considering the profound and permanent nature of the injuries sustained; pain, suffering, and the loss of enjoyment of life; and the costs of care and rehabilitation, we do not find that the award "evinces such bias, passion or prejudice on the jury's part as to shock the conscience" of this Court. Jordan v. McKenna, 573 So.2d 1371, 1378 (Miss. 1990).

VIII.
In the trial of this case, the search for truth focused on a battle of the experts, each armed with a particular view of the parties' conflicting theories of how this tragic accident occurred. After hearing ten days of testimony, the jury, as the ultimate finder of fact, rendered a verdict in favor of the Jacksons. Considering the serious and permanent nature of the injuries sustained, the damages awarded do not shock the conscience of this Court. Having carefully considered the record, particularly the more than two thousand ninety-four page trial transcript, we cannot say that the lower court judge acted with prejudice or partiality in his conduct of the trial. As with any lengthy trial, it was not a perfect trial. It was, however, a fair trial. Accordingly, we affirm the jury's verdict and deny General Motors' petition for rehearing.
AFFIRMED.
LEE, P.J., and SULLIVAN, PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
BANKS, J., concurs with separate written opinion joined by SULLIVAN, PITTMAN and JAMES L. ROBERTS, Jr., JJ.
SMITH, J., dissents with separate written opinion joined by HAWKINS, C.J., and PRATHER, P.J.
HAWKINS, C.J., dissents with separate written opinion joined by SMITH, J. and joined by PRATHER, P.J., in results only.
BANKS, Justice, concurring:
I concur with the result reached by the majority and I am compelled to write a few words in response to the vigorous dissents expressed by my brothers Hawkins and Smith.
As to the spirited argument made by Justice Smith that GM is entitled to a new trial because the verdict is against the overwhelming weight of the evidence, I note that there is a lack of physical evidence to support either view of the manner in which this accident occurred. The physical evidence does not support Mrs. Jackson's version because there is no physical indication that the axle broke in her lane of travel prior to the vehicle flipping. GM's proffered explanation lacks support in the physical evidence because there is no indication of "deep gravel" *316 or other condition on the immediate shoulder of the road which would have caused the phenomena that Mrs. Jackson experienced prior to the vehicle flipping.
Thus we are left with competing explanations, neither of which is completely consistent with the physical evidence found at the scene. What we do know is that the axle broke, that the axle was once tested and found defective and that the axle could not be retested in the same way after it was subjected to further treatment. There is no evidence of improper driving or other cause of the upset. On these facts, a reasonable fair-minded jury could conclude that the axle broke before the flip and contributed to the accident and no bias, prejudice or passion is manifested thereby.
Justice Hawkins insists that the trial was permeated with unfairness because of certain rulings and statements by the trial court. The writer has reviewed the lengthy record and, in my view, when taken in context there is not reversible error based on the court's comments or rulings. Although Judge Williamson spoke too expansively in some instances and ruled incorrectly in others, these instances are a great deal less significant than GM contends.
First, the comments. The statement that certain testimony was consistent with deposition testimony was in response to a plaintiff's request to require more to be read and rejected that request because the part already read was clearly not inconsistent and needed no further clarification. In my view the statement was accurate and caused no harm. The statement regarding what came from the book was to the effect that what had been read from the book was sufficiently pertinent to be put before the jury and the expert's explanation would be just a matter for the jury to consider. The expert witness was at the time interjecting in a colloquy between the court and counsel and while it would have been better for the court not to have responded to the witness at all, and not in this manner, the response was not one which was unduly prejudicial in my view. The failure to sustain the objection to the question regarding GM's answer was error in my view but harmless. The witness handled the question well. Without going into each allegation, in my view, none of the others have sufficient merit to require reversal either singularly or cumulatively.
As to the proposed Marcosky testimony, I accept the view that our rules embody a doctrine that fundamental fairness dictates that parties should not have carte blanche to the experts of parties opposite. Miss.R.Civ. Pro. 26(b)(4)(B); See, Kozar v. Chesapeake & O.R. Co., 320 F. Supp. 335 (D.C.Mich. 1970) affirmed in part and reversed in part on other grounds 449 F.2d 1238 (6th Cir.1971). The ruling regarding the expert Marcosky's testimony was consistent with our rules requiring extraordinary circumstances before a party is allowed access to an expert retained by another party for purposes of trial who is not to testify. Id. See also, Mantolete v. Bolger, 96 F.R.D. 179 (D.C.Ariz. 1982). No such circumstances existed here and the preclusion of the testimony is an apt device to correct the original error in allowing the deposition. Clearly, General Motors has access to a world of independent experts without resort to one chosen by the plaintiffs. It follows that its failure to call an independent expert may not be attributed to its inability to call Marcosky.
Justice Hawkins accepts GM's suggestion that the reference to 18 other accidents was egregious error because there was no "evidence" of those accidents in the record. The fact is that there never is "evidence" in the record during opening argument. Here, in a pre-trial ruling, the trial court allowed the introduction of reports, supplied to plaintiffs by GM, of claims of axle failure in vehicles similar to that in question. The evidence was deemed admissible on the issue of notice to GM. GM sought exclusion based on the contention that there was no proof that the accidents were similar. That objection was overruled. After referring to the accidents in opening argument, plaintiffs declined to offer the reports and as a result there is no record of those reports before this Court. General Motors, then, has failed to preserve the error, if any, by having these reports marked for identification either at trial or pre-trial with reference to its motion in limine. Moreover, once the plaintiffs failed to *317 introduce the reports, GM could have sought a curative instruction. Failing that, when Chiddester was questioned, GM could have shown the reports for what they were on redirect examination. The handling of this issue should not cause reversal.
Neither should the questioning of Officer Brown cause reversal. He was simply asked whether there was evidence of improper driving. We have approved similar testimony in similar circumstances. Seal v. Miller, 605 So.2d 240 (Miss. 1992). True, counsel later, during cross-examination of one of GM's experts, attributed an opinion to Brown that he did not express, that is, that there was in fact no improper driving. There was no objection to this question, however, and the correct opinion was the one repeated in closing argument.
What Linda Jackson said concerning the accident was admissible. Justice Hawkins suggests that no attempt was made to qualify her statement as an excited utterance. M.R.E. 803(2). Hawkins dissenting ante at 332. The record reflects that Brown talked to her at the scene of the accident at a time when she was "excited" and in "a lot of pain." The "tacked-on" opinion expressed by Brown appears to be just that but no objection was made. There is no error here. Moreover, in closing argument, plaintiffs' counsel clearly attributed the interpretation of Jackson's statement to Brown, its source, before arguing the same inference that Brown drew. Counsel quoted Brown as saying "In other words, she said the axle broke," and went on to describe her condition of pain and excitement and contrasted it with what she could have said such as, "I ran off the road and lost control." If any attempt to mislead can be discerned here, it is not enough for reversal.
SULLIVAN, PITTMAN and JAMES L. ROBERTS, Jr., JJ., join this opinion.
SMITH, Justice, dissenting:
Generally, this Court is reluctant to set aside a jury verdict. Occasionally however, an exception presents itself, where the proof overwhelmingly supports the defendant's version and totally belies the plaintiff's case, requiring that this Court reverse and render. The case sub judice certainly meets these criteria; however, the case is so "fouled up," in fairness to the parties concerned, I conclude that the verdict is against the overwhelming weight of the evidence and that this case should be reversed and remanded for a new trial.
This appeal stems from a products liability action filed on November 8, 1985, by the Jacksons against General Motors and Grenada Sales. Linda and Amanda Jackson were both severely injured in a single vehicle accident near Carthage, on December 14, 1984. General Motors had manufactured, and Grenada Sales had sold to the Jacksons, the 1984 GMC Jimmy four wheel drive vehicle that Linda Jackson was driving when the accident occurred. A Leake County jury, following a ten day trial in May of 1990, returned a verdict against General Motors and in favor of the Jacksons in the amount of $7.15 million, prompting this appeal. The jury also returned a verdict in favor of Grenada Sales.
On December 1, 1992, a three judge panel heard oral arguments on the case and two days later, Justice McRae for the Court, handed down a decision per curiam, affirming judgment for the Jacksons. General Motors filed its petition for rehearing in January 1993, alleging inter alia that the most fundamental principle of justice had been violated by the panel's summary decision: it failed to treat like cases alike. General Motors also claimed that serious errors existed, contrary to applicable decisions of this Court, requiring a written opinion by this Court en banc.
The majority opinion correctly states that Miss.Sup.Ct.Rule 35 requires this Court to publish a written opinion only when "to do so will add to the value of the jurisprudence of this state." If ever there existed a case requiring a written opinion, it is this case. The sheer magnitude and complexity of the legal issues of this case require all members of this Court to be fully informed of the facts and the legal issues involved. The previous problems created by the Court's failure to write an opinion, however, are not resolved by the majority opinion, as its substance adds nothing to the value of jurisprudence by this Court.
*318 Additionally, the majority states that this case presented no novel or distinctive issues of law or fact. This statement is incredible. Overwhelming facts favoring General Motors abound within the record. There is no factual support for the verdict of the jury. The physical facts at the scene of the accident do not support the Jacksons' disputed assertions as to the cause of the accident. The jury verdict accepting the Jacksons' version of how the accident occurred is so absolutely contrary to the laws of physics, the operation of natural physical forces, and common sense, that reversal is compelled. In considering the facts and issues, we must conclude that the jury failed to carefully weigh all the evidence, was biased against General Motors, and was influenced by unwarranted repeated, prejudicial comments by the trial judge against General Motors. The majority has the audacity to claim that the trial judge bent over backwards for General Motors. The record wholly fails to support such a claim. Besides, there is no need for a trial judge to bend over backwards for either side. All the judge should do is conduct the proceedings in a manner which is fair and impartial to all litigants.
This appeal presents numerous meritorious and distinctive issues of law which should have been addressed by the majority, particularly since these issues were considered and discussed at length by this Court. Unbelievably, the majority chooses to address only two issues of law and ignores all the others.
A careful reading of this record and arguments requires that I part company with the majority. I join the dissent of Chief Justice Hawkins on the issues of law, but write separately regarding the overwhelming weight of the physical evidence and testimony which belie the Jacksons' version of the cause of this accident.
The majority opinion omits critical facts. The accident happened on Highway 487, just after the Jackson vehicle passed Don Davidson's gravel driveway. Linda Jackson was traveling in the westbound (north) lane, when suddenly the vehicle headed south, crossed the center line, then swung back with the front of the vehicle facing north. While in the eastbound (south) lane, the GMC Jimmy skidded sideways to the left, leaving black "yaw" marks in the eastbound (south) lane. The vehicle rolled over three times, ultimately ending up in the ditch on the north side of the highway near a pond. The left rear wheel came to rest on the north side of the road approximately 12 feet away from the vehicle and approximately 2 feet into the pond. Linda Jackson told Juanita Mitchell, the first person to arrive on the scene after the accident, "Well, suddenly, it seemed like I run into some real deep gravel and I had no control, or could not control the car." Mrs. Jackson testified at trial that "she felt a bump."
Linda Jackson's testimony at trial contradicted her deposition. At trial, on cross-examination, she was asked, "Is your testimony that as you felt this bump, that  and the vehicle went out of control, is your testimony that you were in the lane of travel headed west at that time?" She answered, "When I felt the bump, yes. After that the vehicle went out of control... ."
In her deposition Linda Jackson was asked, "Do you know when you lost control of the vehicle, whether your vehicle was partially on the shoulder, or was it in the westbound lane?" Mrs. Jackson's response was, "I don't have any knowledge." From what she told Mitchell, from her deposition, and her testimony at trial Jackson manifestly had no idea what caused this accident.
Regardless, there were absolutely no marks attributable to the accident left upon the pavement in the westbound (north) lane of the highway, which was Linda Jackson's proper lane of travel at the time she said the axle fractured. How could this be possible if the axle broke in the westbound (north) lane? All marks associated with the accident were located in the eastbound (south) lane, which was Jackson's improper lane of travel. (See App., Ex. D-28-5).
The Jacksons contend that the axle broke at the flange, resulting in the left rear wheel leaving the vehicle and causing Linda Jackson to lose control of the vehicle. This was the version of their expert G.L. Rhoades, *319 who testified that the axle shaft was defective. Rhoades expressed the opinion that the left rear axle broke off and the left rear wheel folded underneath the vehicle, subsequently exiting out the rear bumper area. Jackson testified that she had been driving normally along the highway at a speed of approximately 50 to 60 miles per hour at the time the accident occurred. There had been no prior major mechanical problems with the Jacksons' vehicle.
General Motors maintains that the accident was caused by Linda Jackson's glancing often at her baby, momentarily running slightly off the westbound (north) lane, losing control of her vehicle, darting into the improper eastbound (south) lane, and "oversteering", causing the vehicle to go into a sideways slide or "yaw" in the eastbound (south) lane of the highway. (See App., Ex. D-28-5, and Ex. D-37-16). General Motors further contends that after the "yaw" marks occurred, the left rear axle shaft fractured from a severe impact during a rollover of the Jackson vehicle. General Motors denied that the axle was rendered defective in the manufacturing process.
If the accident had been caused by a broken axle as the Jacksons' claim, it would have been quite impossible for any (much less all three) of the following facts to have occurred: (1) the undisputed type and location of the marks on the pavement; (2) the undisputed damage to the vehicle; and (3) the undisputed location of the left rear wheel when it finally came to rest. The General Motors' version is consistent with every physical finding and with the laws of physics.
Even in my brief tenure on this venerable Court I have grown accustomed to abrupt departures by this Court from settled State law, but this is my first encounter with this Court's authority to change Almighty God's laws of physics.
Surely, a copy of the majority opinion will be sent to the departments of physics and engineering in all of our great colleges and universities. The findings of the majority have significantly altered scientific theories in the area of mechanical engineering and vehicular dynamics that have long been studied and espoused in the classroom. New laws of physics have been announced today and curricula need to be adjusted accordingly.
To find the plaintiffs story credible, one must accept the incredible. According to Rhoades, a car traveling 55 to 60 m.p.h. down the highway, can suddenly have its left rear axle snap and break, have its left rear wheel break off and, instead of flying off to the left, fold flat underneath the vehicle so that the left rear tire is punctured by the front edge of the leaf spring, and the wheel, with the full weight of the vehicle resting upon it, slides along the surface of the highway. Furthermore, according to Rhoades, the wheel, after skidding and folding flat underneath the vehicle and leaving no marks of any type on the highway, somehow uprights itself and proceeds to roll down the highway at the same time leaving two black "yaw" marks in the eastbound (south) lane of traffic. Finally, in this world according to Rhoades, the wheel after righting itself, suddenly changes direction and rolls off into the ditch on the north side of the highway.
The evidence at the scene shows that the axle fracture was not the cause of the GMC Jimmy's going out of control and rolling over three times. Instead, it was simply one of many damages to the vehicle resulting from the vehicle's rollover.
Under the Jacksons' theory of causation, no left side force broke the axle, it simply fractured due to the negligent manufacturing process. Yet, they maintain, in the breaking and snapping process, the axle somehow exerted a tremendous left side force to the wheel and assembly, bending it all underneath the vehicle. Pardon me, but the overwhelming evidence is to the contrary.

DISCUSSION
General Motors supported the non-defective axle theory through its experts, Dr. Edward Reynolds and Dr. Jerry Chiddister, who testified that the manufacturing process for the axle was proper and that the accident was caused by driver error. The Jacksons' experts, G.L. Rhoades and Edward Cox, admitted that the axle shaft met all General Motors' manufacturing specifications, including *320 those for case depth and hardness, but maintained that the axle broke due to an improper manufacturing process.
The majority makes much of the axle shaft's having been "retoccoed", or twice placed in the heat induction hardening machine (Tocco). This process ensured that the axle shaft met General Motors' specifications and, for that matter, the standards of the automobile industry. This was conceded by Cox.
Reynolds testified that the left rear axle from the Jackson's vehicle met General Motors' metallurgical specifications for case hardness, case depth and hardness, microstructure and further that it complied with all metallurgical and chemical specifications and "that the reliability of the manufacturing process was excellent, with fine inspection of the product." Reynolds testified that the Jackson axle also met the specifications of the Society of Automobile Engineers. Dr. Reynolds stated that the fracture on the Jackson axle was typical of fractures resulting from a bending impact force. He further testified that he had examined the case depth on the fracture, and that the case depth, or heat affected zone, met General Motors' specifications.[1] Dr. Reynolds testified that through a process known as scanning electron microscopic examination, he examined the Jackson axle and found that in the hardened case, that the axle shaft core or its center had typical characteristics of a properly manufactured normal axle shaft.
The Jacksons' experts, Rhoades and Cox, admitted that there were no cracks in the shaft other than in the area of the fracture. Obviously, these cracks on the flange area of the axle were precisely what General Motors experts maintained. They were secondary cracks resulting from the fracture of the axle shaft caused by the severe impact upon the left rear wheel during rollover in the accident. Frank Myers and James R. Leonard, both of whom worked at the Saginaw-Buffalo plant in New York where the axle was manufactured testified that during all their years at the plant, they had never seen a "quench" crack[2] in an axle. Additionally, the plaintiff's own witness, Alan Machtel, a supervisor who had worked at the Buffalo plant for 12 years, stated that he too had never seen a "quench" crack in an axle.
Dr. Reynolds's and Dr. Chiddister's expert opinions were that this accident was caused by Linda Jackson's "oversteering" and losing control of the vehicle. Her loss of control put the vehicle in a lengthy sideways slide or "yaw" to the left in the eastbound (south) lane, (See App., Ex. D-28-5, and Ex. D-37-16) climaxing with rollovers (See App., Ex. D-28-3 and Ex. D-27-2-21) and extreme impact which fractured the axle when the vehicle came down upon the left rear wheel. The rollovers started at the end of the "yaw" marks in the eastbound (south) lane and continued into the westbound (north) lane. (See App., Ex. D-28-3 and Ex. D-27-2-21).
The Jacksons' first expert, John Marcosky, was deposed, and was later designated by the plaintiffs as a non-testifying witness, after he had expressed the opinion that the axle fractured on impact during a rollover. General Motors and Grenada Sales wanted to call Marcosky as a witness to give his opinion as to the cause of the accident, but the trial judge refused to allow Marcosky to testify at trial. The majority opinion states Marcosky presented an opinion similar to that espoused by General Motors' experts. The majority claims Marcosky testified that he believed the axle broke in mid-air during the rollover. The majority once again is wrong. Marcosky's opinion was identical to General Motor's experts and Marcosky never testified that the axle broke in mid-air. His exact testimony was as follows:
Q. Do you have an opinion as to the cause of the fracture of the axle shaft in the vehicle that is the subject of this litigation?
A. Yes, sir.
Q. What is that opinion?

*321 A. The axle shaft fractured during the roll sequence when the vehicle apparently was airborne and contact was made to the left rear tire and the road surface resulting in deformation to the rim assembly and fracture of the axle shaft. (emphasis added).
The Marcosky version clearly has the vehicle in the air during a rollover, coming down with hard contact on the left rear wheel, thereby causing the axle to fracture at the flange area. The majority, of course cannot cite credible factual evidence to support the Jackson's theory concerning the cause of this accident. The majority opinion cannot provide a credible explanation, because the physical facts and circumstances contradict every hypothesis it advances.
General Motors contends that the three judge panel's per curiam decision ignores this Court's established precedent and that the judgment of the circuit court cannot stand. General Motors is correct.
Generally a case should not be removed from a jury and this rule has been strongly adhered to by this Court. In McGovern v. Scarborough, 566 So.2d 1225 (Miss. 1990), this Court held:
A case should never be taken from the jury if, from the facts favorable to the party adversely affected together with all reasonable inferences therefrom, it can be said that a rational jury could find in his favor. Read v. Southern Pine Electric Power Ass'n, 515 So.2d 916, 919 (Miss. 1987); White v. Hancock Bank, 477 So.2d 265, 269 (Miss. 1985); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975). This Court is never unmindful of this rule.
Id. at 1228.
The case of Elsworth v. Glindmeyer, 234 So.2d 312, 317-319 (Miss. 1970) sets forth the standard for a directed verdict where the facts of the alleged accident fail to support the plaintiff's position and the verdict is contrary to the overwhelming weight of the evidence. In Elsworth, the Court found a new trial was required in a situation where the verdict of the jury was contradicted by the physical facts at the scene of the accident. This Court held: "We must hold that the verdict of the jury based upon the testimony of appellee Cuevas is clearly and manifestly against all reasonable probability and therefore the judgment must be reversed." Id. at 320. In Elsworth, the proof showed that there were no skid marks on the roadway, prior to the accident. Thereafter, mud, dirt, debris and oil were all found in the decedent's lane of travel, and there was but a small amount of glass in defendant's lane of travel. The Elsworth Court held the verdict against the defendant was against the overwhelming weight of evidence. Id. at 313.
In the case sub judice, all of the physical markings attributable to the accident are located on the pavement in the eastbound (south) lane or improper lane of traffic for Linda Jackson, making it impossible for the axle to have suddenly fractured, forcing the left rear wheel to break off and fold underneath the vehicle, all without leaving a trace of evidence in the westbound (north) lane in which she was normally travelling. The physical evidence at the scene and examination of the relevant mechanical parts of the Jackson vehicle contradict the Jacksons' claim as to how the accident occurred. The Elsworth court cited Teche Lines, Inc. v. Bounds, 182 Miss. 638, 649, 179 So. 747, 749 (1938), in which Justice Virgil A. Griffith, speaking for the Court, stated as follows:
If there be any one thing in the administration of law upon which the decisions, the texts, and the general opinion of bench and bar are in agreement, it is that evidence which is inherently unbelievable or incredible is in effect no evidence and is not sufficient to sustain a verdict. This is true even in those jurisdictions which still cling to the scintilla of evidence rule. And, except in the few jurisdictions wherein the latter rule prevails, the overwhelming weight of authority throughout the country is that believable or credible evidence in civil cases is that which is reconcilable with the probabilities of the case and that bare possibilities are not sufficient. Where evidence is so contrary to the probabilities when weighed in the light of common knowledge, common experience, and common sense that impartial, reasonable minds cannot accept it other than as clearly *322 an improbability, it will not support a verdict.
See also Yazoo & M.V. Railroad Co. v. Skaggs, 181 Miss. 150, 179 So. 274, 278 (1938) in which this Court held: "As this Court has frequently said, verdicts and judgments in civil actions must be based on the probabilities of the case, not on possibilities; and a verdict, although it is treated with great respect, has no force to convert a possibility into a probability." Id. 179 So. at 278. The most that any of the Jacksons' evidence could amount to is a mere possibility, never a probability.
Again, this Court in Elsworth, quoting from Spiro v. St. Louis Transit Co., 102 Mo. App. 250, 262, 76 S.W. 684, 688 (1903) stated:
This prerogative of courts of error is sparingly employed, but that it exists, as an emergency expedient, for the correction of verdicts palpably wrong, is certain. The appropriate use of it does not require a court to be convinced that the jury found an event to have occurred that was physically impossible or miraculous. It is enough if the event found was so improbable, according to ordinary operation of physical forces, or was so overwhelmingly disproved by credible witnesses, as to compel the conviction that the jury either failed to weigh the evidence carefully, or drew unwarranted inferences, or yielded to a partisan bias.
234 So.2d at 319.
In the case sub judice, the physical evidence at the scene and an examination of the appropriate relevant mechanical parts of the Jackson vehicle conclusively prove that the axle shaft did not break during normal driving use. As in Elsworth, the only possibility upon which the Jacksons' theory could prevail, would be a miracle. Here, we are not required to look for a miracle, the overwhelming weight of the evidence is that the axle shaft broke as a result of a severe impact to the left rear wheel and axle assembly during the rollover of the Jackson vehicle. In fundamental fairness, the facts in this case mandate reversal and remand for a new trial.

I.

ABSENCE OF MARKINGS
The absence of marks upon the pavement in Linda Jackson's proper lane of travel, the westbound (north) lane of Highway 487, is worthy of discussion. (See App., Ex. D-28-5). The Jacksons' and their expert Rhoades' theory of this accident is that the axle shaft, being defective, broke at the flange area, causing the left rear wheel to fold under the vehicle. They contend that after the axle broke, the left rear tire was punctured by the front edge of the leaf spring, dragged underneath the vehicle and that it ultimately exited under the left rear bumper area of the vehicle.
Rhoades tendered to the jury a taped video demonstration which purported to depict the Jacksons' theory of how the accident occurred. The video tape depicted a stationary vehicle in a jacked up position, which was suddenly allowed to fall, as though its left rear axle had fractured. This maneuver was accomplished by speeding up single frame pictures, giving the illusion of motion. Rhoades testified, "Lets go on through the pictures now, and we'll put it all together on the video and give it some motion and life." (emphasis added). Rhoades' weak attempt to give life, hence credibility, to this staged video is dead on arrival. This misguided purportedly re-enacted evidence should never have been allowed in the first place. The relevancy of the demonstration is highly questionable because it failed to simulate the actual nature of the events, the conditions in effect at the time of the accident, and the mechanics of the Jackson vehicle. This kind of demonstration would tend to confuse and mislead the jury. According to Jackson, the axle fractured under supposedly normal driving conditions, with the vehicle moving at the rate of 55 to 60 m.p.h., not as in Rhoades' video while the vehicle was at a dead-stop. That presents the major flaw to the Rhoades demonstration. It seemingly never occurred to Rhoades that the wheel was actually traveling 55 to 60 m.p.h. when, according to Rhoades' theory, it broke off of the axle and that its movement would have been affected by the fact it was in motion. Rhoades apparently *323 never heard of Sir Issac Newton and his laws of gravity and motion.
Cut an axle in half on a stationary jacked up vehicle and the wheel will simply drop. Newton, "Law of Gravity."[3]
But, if the vehicle is moving forward at the rate of 55 to 60 m.p.h., some 80 feet per second, if the axle suddenly snaps in two, as Jackson claimed, that wheel is going to roll. Newton, "Law of Motion."[4]
Newton's laws applied precisely in the General Motors video demonstration of a vehicle travelling 55 to 60 m.p.h., with a sudden breaking of the axle, as Jackson alleged happened to her axle. The loose wheel sped out to the left side of the vehicle and forward some 700 feet distance past the point of breakage of the axle.
If a refutation of Rhoades' theory was needed, General Motors' video demonstration duplicating how Jackson claimed the accident occurred, showed precisely that what Rhoades said caused the accident was an utter impossibility.
There is no dispute but that the vehicle Jackson was driving was traveling some 55-60 m.p.h. down the highway. That is some 80 feet per second. Now, if what Rhoades said happened after the axle  according to him  just broke, did in truth and in fact really happen, one has to wonder why the plaintiffs did not duplicate it by an experiment conducted under comparable conditions. General Motors by experiment and video demonstration showed what would happen with an axle breaking on a Jimmy traveling at this speed.
The answer, of course, is that neither Rhoades nor anyone else could duplicate or demonstrate the plaintiff's contention by a comparable experiment. It would be easier to walk on water than to duplicate what Rhoades said happened by any realistic experiment or comparable demonstration. Rhoades' "demonstration" of what he says happened would be laughed out of a fifth grade classroom.
Also, the Jackson theory according to Rhoades, did not explain the flattened portions of major mechanical components of the vehicle, including eight ball bearings. (See App., Ex. D-27-1-59). This feat of flattening would have required tremendous left side force. The Jacksons cannot explain that which is an impossibility. Under the Jackson version, there would have been insufficient left side force to cause this type of damage to the mechanical parts on the vehicle. If, as the Jacksons maintain, the axle broke while the wheel was rolling 50-60 miles per hour and folded underneath, and the front edge of the leaf spring had punctured the tire when the full weight of the vehicle fell upon it, there would have to have been markings of either rubber from the tire and or a combination of rubber and metal scraping on the pavement, as the vehicle dragged the wheel down the highway. The Jacksons admit there are no such marks in existence in the westbound lane of traffic. (See App., Ex. D-28-5).
There are other problems with this staged video too: (1) the video was not made under Rhoades' supervision, but rather was filmed some two years before; (2) the video was not an accurate demonstration of anything which occurred; and (3) the video was not shown to opposing counsel until the night before it was offered to the jury as evidence. The video tape should never have been admitted into evidence as it was not relevant and it had no probative value.
General Motors countered the Jacksons' version with a video of a GMC Jimmy vehicle used as a test vehicle actually traveling at 55 miles per hour, with the axle having been previously cut at the flange area. When the test vehicle's left axle fractured at the flange *324 area, where it had been partially cut, the left rear wheel flew out to the left side and continued some 700 plus feet down the roadway from that point. The Jacksons' theory can never alter the laws of physics and motion. The absence of any pavement markings from the accident in the westbound (north) lane conclusively disproves the Jacksons' claim.
Rhoades and Cox also testified that the left axle broke at the beginning of the "yaw" leaving marks in the eastbound (south) lane. Rhoades testified that "the axle broke at the beginning of the tire marks." But these marks are well past the Davidson's gravel driveway. (See App., Ex. D-28-1). This would clearly place the Jackson vehicle in the eastbound lane (the improper lane for Linda Jackson), skidding sideways and out of control, with the left front and rear tires making the visible "yaw" marks, as depicted in the photographs admitted into evidence. (See App., Ex. D-28-5). This would, according to Rhoades, have occurred before the axle broke. Yet, Linda Jackson testified that she initially lost control of her vehicle in the westbound (north) lane when her axle broke and the wheel came off. This situation is impossible for two reasons: (1) Both left wheels, which made the "yaw" marks, had to be properly attached to the vehicle at that time, as shown in the Baker Traffic Accident Investigation manual, a standard manual used in accident reconstruction, which was admitted into evidence. (See App., Ex. D-26, Ex. D-28-5, and Ex. D-37-16). (2) There are no markings in the westbound (north) lane on the pavement to support this theory that Jackson was in the westbound lane when the axle fractured.
The "yaw" tire marks prove that the axle shaft did not break under normal driving as Linda Jackson claims. All witnesses testified that the vehicle went into the sideways slide in the eastbound (south) lane. The jury had the benefit of the Baker Traffic Accident Investigation Manual in order to compare the "yaw" marks in photographs of the scene of this accident with known samples of identical markings shown in the manual. (See App., Ex. D-26, Ex. D-37-16). The marks shown by the pictures in evidence in this case are identical to the typical tire marks shown in the manual. The marks shown in the photos are clearly rubber tire marks. The Baker manual clearly shows and states that the left front wheel would leave the visible skid mark on the right side of the photo and the left rear wheel would leave the darker skid mark visible on the left side of the photo. An examination of the Baker Manual reveals that Exhibit 55 in the manual is virtually identical to Exhibit D-37-16 in the case sub judice. The notation under Exhibit 55 in the Baker Manual states: "If the striations in a tire mark are oblique to the tire mark, the wheel is rotating. Then the mark is a yaw mark and the tire is sideslipping." (App., D-26, p. 17-23). Consequently, we know without a doubt that the left rear wheel on the Jackson vehicle was properly attached to the vehicle and was "rotating" when the "yaw" marks were made in the eastbound (south) lane. The two very visible black "yaw" marks, depicted in the photographs in evidence, prove the axle was intact during the skid, and that the left rear axle and wheel had to be properly attached on the vehicle to make the two tire marks on the pavement. According to the Jacksons' version, the wheel folded underneath the vehicle. Any markings on the pavement under that sort of theory would certainly not resemble the markings clearly visible as tire "yaw" marks in the photographs. According to the Jacksons' version, there should be marks of a flattened tire on a wheel rim dragged upon the pavement, due to the weight of the vehicle upon it. No such marks exist, because the accident could not possibly have occurred in such a manner.

II.

DAMAGE TO VEHICLE'S PARTS
There is no dispute regarding the damage to the Jackson vehicle caused by the rollovers during the accident. (See App., Ex. D-29). The damage to the axle parts and surrounding mechanical components on the Jackson vehicle conclusively proves that the axle broke as a result of severe impact upon the left rear wheel during rollover. The photographs admitted in evidence clearly point out what General Motor's experts described *325 about each relevant part's appearance and condition, following examination subsequent to the accident. All affected parts had a flattened area on the exterior portions, indicating extreme left side force. The left rear (See App., Ex. D-29) and the right rear (See App., Ex. P-3-L) wheel rims were bent due to extreme force during rollover. The axle shaft was bent downward and from the left side, which under normal laws of physics, indicates extreme force from the left side. It had "Brinell" marks (dents) both in the bearing area and on the button (inside) end.
The bearing surface was bent in similar left side fashion. Reynolds in testimony showed the jury how eight of the roller ball bearings were bent or flattened on one side due to the tremendous force that came down from the left side upon the axle. (See App., Ex. D-27-1-59). The bearing oil seal was similarly damaged.
The wheel bearing cage was flattened and the bearing flattened at the edge. (See App., Ex. D-27-1-59). Indentation markings were on the outer race bearing. The outer edge of the axle tube was bent. The flange itself was similarly bent. There was an indentation on the button end of the shaft. The wheel rim was bent in similar fashion. The brake drum was bent sideways from a downward tremendous left side force.
The brake backing plate was not worn off on the bottom. This is very significant. This part of the Jackson vehicle would be the first metal part to make contact with the pavement if the wheel had just come off under normal driving conditions. This wearing off of the brake backing plate was clearly demonstrated in the General Motors video.
As previously noted, in order to demonstrate the impossibility of the Jackson version, General Motors filmed a video of a GMC Jimmy vehicle, with an axle previously cut at the spot on the flange area where the Jackson axle had fractured. During normal 55 mile per hour driving of the test vehicle, the left rear axle eventually fractured after driving approximately 17 miles and the left rear wheel of that vehicle went flying off to the left side ending up on the left side of the roadway, some 700 feet down range from the point of breakage. In the case at bar, the wheel ended up on the right side of the roadway out into the edge of the pond within 12 feet of the vehicle, indicating along with the other facts, that the General Motors version is the probable cause of this accident.
In the General Motors demonstration video, when the wheel left the vehicle, the brake backing plate struck the pavement and immediately began to leave a long straight scrape mark, which subsequently turned black due to the brake fluid that began to drain on it. In the case sub judice, the brake backing plate was not sheared off from dragging on pavement, it was bent inward, conclusively showing a tremendous left side force. In the General Motors demonstration test vehicle, there was damage of shearing or dragging to the U-bolts where the nuts were screwed on the bolts. (See App., Ex. 27-1-59). U-bolts are what hold the rear leaf springs in place and by necessity, as in the General Motors video demonstration, there were drag marks on the pavement and wearing on the bottom portion of the U-bolt parts, due to their making contact with the asphalt.
The Jackson vehicle was totally devoid of any wearing off of the U-bolts. Additionally, there was an absence of drag marks on the pavement in either the westbound (north) lane or the eastbound (south) lane. The only markings in the eastbound (south) lane after the "yaw" markings of the tires are spaced out metal scrape markings, not tire markings, indicating rollover and nothing more. These spaced out metal scrape markings continue on across the westbound (north) lane, as the vehicle rolled over several times as it headed for the ditch and pond area where it came to rest. (See App., Ex. 28-3 and Ex. 27-2-21). Additionally, the driver never lost control of the vehicle in the General Motors video demonstration, the vehicle simply lost power and shut down. However, under the Jackson version, when the left wheel came off the vehicle during normal driving in the westbound lane of traffic, Linda Jackson totally lost control of the vehicle.
Dr. Edward Reynolds testified regarding his metallurgy examination of the parts through magnification; he found the point of *326 origins on the fracture face, he found a problem with the compression chip and he found that the fracture area did not contain quench cracks, but rather contained secondary cracks which follow any fracture from the origin to the surface.
The overwhelming factual physical evidence supports General Motors version of what caused this accident. Linda Jackson took her eyes off the road momentarily to check her baby and either ran slightly off the right side edge of the pavement or drifted out of her proper lane. Linda Jackson testified that she felt a bump. She quickly jerked the steering wheel in order to compensate for her error and found herself in an "oversteer" situation, within the wrong lane of traffic. She would have had to make a sharp right hand turn on the steering wheel to get back into her proper west bound lane of traffic in order to get her vehicle into that type of "yaw" or "fishtail" left slide as depicted by the photographs. Linda Jackson testified that it seemed like she was in deep gravel. To a driver experiencing this "oversteer" sensation, it could well have felt like she was in deep gravel. The sensation is a top heavy, rear end "fishtailing" effect.
Rhoades even admitted on cross-examination, that after Linda Jackson left her westbound (north) lane and entered the improper eastbound (south) lane, her vehicle of necessity would have had to be in a southward angle while in the eastbound lane. Rhoades also had to admit that Linda Jackson would have had to make a right turn on the steering wheel while she was in the eastbound lane, in order to position the vehicle in a left sideways slide. Rhoades testified as follows:
A. Mrs. Jackson's vehicle had a very slight angle towards the south before she left the westbound lane and entered the eastbound lane.
Q. And you admit, do you not, that she had to make, Mrs. Jackson had to make a right turn to get into the yaw position skidding?
A. Well, I think you need to explain that.
Q. Well, I'm asking you to explain it.
A. I'll be glad to explain it.
Q. All right.
A. I've testified that she had a right steering input...
Q. When she made her right steer is when the car started to skid, is it not?
A. It is indeed.
What Rhoades cannot account for is Linda Jackson's claim that she lost control in the westbound lane when the axle broke and the wheel came off and no markings of any type were left on the pavement in either lane until she went into a left sideways slide in the eastbound lane.
This case is not about an award of seven million dollars against General Motors. The damages in the case sub judice were not even disputed by General Motors. The damages were very substantial and will last a lifetime for the Jackson family. Each family member involved suffered severe harm as a result of this accident. Nothing can restore the lives they had before this accident. The issue in this case is causation. General Motors cannot be held liable for the damages suffered by the Jacksons unless there is proof that something it did or failed to do was the direct proximate cause of the accident. The verdict is against the overwhelming weight of the evidence where the physical facts totally contradict the plaintiff's version of causation, and overwhelmingly support the defendant's version. A second important issue is the guarantee of a fair trial for all litigants in this state's civil justice system. This Court has stated on many occasions, that a litigant is entitled to a fair and impartial trial, but not a perfect one. This case was neither perfect, nor fair. Therein lies the problem. Fairness and equal treatment under the law are all anyone ever desires of our judicial system. Because of the distinct facts, which overwhelmingly support General Motors' theory of the cause of this accident, and rebut the Jacksons' theory, and because of the numerous, significant errors pertaining to issues of law set out in the dissenting opinion of my colleague, Chief Justice Hawkins, I too am compelled to dissent. I would reverse and remand this case, granting to General Motors the fair trial to which they were initially entitled, but failed to receive.
I respectfully dissent.
HAWKINS, C.J., and PRATHER, P.J. join this opinion.

*327 APPENDIX

*328 
turns sharply, it tends to roll toward the outside of the curve. Then its weight shifts to the outside tires just as the weight shifts from rear to front in braking. The force tending to roll the vehicle over is the centrifugal force of the turn acting at the vehicle's center of mass pushing outward, and the road drag, pushing inward at wheel level as shown in Exhibit 59 (which compares with Exhibit 20 for a braking skid). The effect of these forces can actually be seen in a vehicle on a fast turn as illustrated in Exhibit 60. Additional weight on the tires on the outside of the turn produces more friction heat and makes a stronger mark than the tires on the side of the vehicle toward the inside of the turn. The tire with the greater load is not only over-deflected for that reason, but it is also side deflected so that most of the weight is concentrated on the outside edge of the tire as shown by Exhibit 61. Sometimes the thrust is so great that the side deflection actually brings the sidewall of the tire in contact with the road as in Exhibit 62. This may wear a hole in the sidewall (Exhibit 63).

Observing and Measuring
Measurements to locate yawmarks are much more complicated than those to locate skidmarks. Simple measurements of the length of the marks are not much use; measurements must be sufficient to plot the marks on a map. That means locating a spot on each mark at 10- or 20-ft (15-meter) intervals as explained in Topic 828.
Direction of striations. When examining yawmarks, look for striations, and if any are visible, note their direction with respect to the mark. Perhaps the best way to do this is to photograph them, but they can also be shown on a field sketch made to record measurements.
On such a field sketch, a single, continuous, curved line can represent the path of the tire. If striations show along the yawmark, indicate their angle of slippage by little cross marks as in Exhibit 64.

3. ACCELERATION SCUFFS

Definition
An acceleration scuff is a scuffmark made when sufficient power is supplied to the driving wheels to make at least one of them spin on the road surface.

*329 

How Made
Only cars with great power for their weight can generally leave accelerating scuffs on hard, dry paving. Ordinary cars can do it momentarily by "scorching" or engaging the clutch suddenly while the engine is running fast. On gravel or especially in mud and snow, accelerating scuffs often appear at the beginning of tire prints.

Characteristics
On a hard pavement, a few feet of an acceleration scuff looks just like a braking skidmark (M in Exhibit 65). On soft, or loose material, however, you can see a difference. The spinning wheel kicks loose material backwards out of the furrow.
The beginning and end of an acceleration scuff are quite distinctive. If the vehicle is stopped on paving to begin with, the tire spins in one place for a moment before the vehicle begins to move on. That spot becomes very hot and leaves a very dark mark on the road surface. Sometimes, on bituminous concrete paving, the bitumen melts and the spinning tire digs out an actual depression in the surface (S in Exhibit 65). But if the vehicle is moving when the wheel begins to spin, no special starting spot is made.
The end of the acceleration scuff gradually fades out as the vehicle reaches a speed at which the tire is no longer slipping on the road surface (E in Exhibit 65).
Often, as the car accelerates, weight shifts to the rear (as contrasted to the front in braking), tires are overloaded, overdeflect, and leave edge marks. Thus, a section of such a mark would look much like a braking skidmark or perhaps a flat-tire mark.
Two-wheel acceleration scuffs occur when the vehicle has a limited slip ("Positrack") differential that prevents a single wheel from spinning. Sometimes cars without such differentials leave two marks for a short distance when accelerating very rapidly.
Roadway "artwork" is produced, usually by smartaleck drivers, who back up and then shift gears to start forward before they have stopped going backward. That leaves a hook in the scuffmark where the car stopped going back and started going forward. The spinning wheel has lost traction and if both wheels spin, the vehicle can easily slip downhill on a cross slope. Sometimes these loops are repeated to leave an elegant pattern on the road such as shown in Exhibit 66. By this means, the driver tries to impress on-lookers or passengers in the vehicle.
Studded tires are intended to give improved traction on slippery surfaces. On a spinning wheel, they can dig into ice and snow to get a better grip on the road. If, while the wheel is spinning, studs strike the pavement, they may leave a special form of scratching which has a "braided" appearance (Exhibit 67). This is not clearly visible while the road is wet or snow-covered, but it is easily seen when the road dries. If a wheel spins for several revolutions on one spot, marks left by studded tires show less clearly the mark of each stud. Studded-tire skidmarks look different; they are straight parallel scratches without the "braiding" effect (Exhibit 9).

Significance in Accidents
Purposely made acceleration scuffs are rarely produced by vehicles involved in accidents. But sometimes at the scene of an accident, especially on rural roads, there may be acceleration scuffs which were there before the accident. These may be confusing (Exhibit 37) if you do not recognize them at once for what they are.

*330 
It is possible for vehicle accelerators to be stuck wide open and so make acceleration scuffs; but this is less common than acceleration scuffs made when a driver mistakes the accelerator for the brake and floors the gas pedal to try to stop the vehicle. Then you have the often difficult task of trying to determine whether tiremarks on the road were due to acceleration or braking.
Driver skill. Race drivers, trying to make the best possible speed on sharp turns, sometimes steer a car into a yaw on purpose and then accelerate toward the inside of the curve after the car is headed sufficiently in that direction. But most truly skillful drivers do not let themselves get into situations where quick turning may produce a yaw because that is how a driver starts to lose control. When a yaw begins, steering in the direction of the rear wheel slide to straighten the vehicle out will, if not overdone, correct the situation. But many drivers do not have the experience and skill to know just how much to correct, with the result that they overreact. At slow speeds correction is not difficult, but at high speeds, the road is too narrow and the swerve too quick to correct an overreaction and put the vehicle back on course. Then the vehicle goes off the road, partly sidewise.

Life of Acceleration Scuffs
The main part of an acceleration scuff has about the same life as a skidmark, because it is made in much the same way.
Where the beginning of an acceleration scuff has dug into the surface of the roadway (S in Exhibit 65), the depression will last for years or until the road is repaved.
Where the end of the scuff tapers off, the mark is light to begin with and so wears away. This makes the mark appear shorter as time passes. Exhibits 68 and 69 show an acceleration scuff soon after it was made and 42 days later.

4. FLAT-TIRE MARKS

Definition
A flat-tire mark is a scuffmark made

*331 
*332 
*333 
*334 
*335 
*336 
*337 HAWKINS, Chief Justice, Dissenting On Petition for Rehearing.
I respectfully dissent.
First, I join Justice Smith that under the facts as shown by this record, no rational jury could believe that while Jackson was driving down the highway all of a sudden the left rear axle just broke. And, but for the prejudicial errors the circuit judge permitted against the defendants  or worse, committed himself  this jury could not have, either.
For anyone who cares to read the record, or simply look at the photographs, it is clear that the physical facts completely belie Jackson's version. The majority has either failed to read the record or assumes no one else will. Justice Smith makes this abundantly clear.
If this case were reversed on the facts, there would be no need to recite the many melancholy trial errors, except those which might recur on retrial. Because this case is not being reversed on the facts, however, I additionally address a number of the trial errors, any one of which require reversal. The majority informs us this was a "fair" trial. Indeed.

WHITE  MARCOSKY
"[A]nd the truth shall make you free." John 8:32 (KJV).
The success of every tyrant, corrupt government, or scoundrel depends upon one tactic: concealing the truth.
Court trials in a free nation, however, exist for precisely the opposite reason: to bring it all out in the open, to get the whole truth. Michigan v. Harvey, 494 U.S. 344, 351, 110 S.Ct. 1176, 1181, 108 L.Ed.2d 293, 302-03 (1990); Fenlon v. Thayer, 127 N.H. 702, 706, 506 A.2d 319, 321, 66 A.L.R.4th 203, 208 (1986). Indeed, justice itself depends on the judge and jury hearing all the facts in a lawful trial. A judge who denies a party this fundamental right to bring it all before the jury betrays this central purpose of a court. That judge's court becomes something less than a temple of justice and sophistic excuses cannot remove the blot.
This glaringly is this case. First, counsel for one side inform the court and opposing counsel that here is a witness we will call and put in the witness chair, and this is what he will testify. Counsel subsequently find that their witness is going to testify precisely opposite to what they had informed the court and opposing parties. Then, counsel have the audacity to tell the other side that they are not going to use this witness, and the other side cannot, either. And the circuit judge lets them get away with it. And this Court approves! Can anyone believe this? Sadly for the jurisprudence of this State, it is true.
One of the guarantees of due process of law under our State and the U.S. Constitution is for every litigant to have the jury hear competent testimony from witnesses and any other competent, relevant evidence. Jackson v. Procunier, 789 F.2d 307 (5th Cir.1986); Ryland v. Shapiro, 708 F.2d 967 (5th Cir.1983); Whittley v. City of Meridian, 530 So.2d 1341 (Miss. 1988); McCay v. Jones, 354 So.2d 1095 (Miss. 1978); Wisdom v. Stegall, 219 Miss. 776, 70 So.2d 43 (1954).
To avoid burdening the reader with detailed facts regarding Marcosky in the body of this opinion, I have set them out in an attached appendix. In summary, Marcosky was selected by plaintiffs' Michigan lawyer, White, to testify as a witness in this case. In sworn answers to interrogatories, for the court and opposing counsel, plaintiffs named and gave the address of John Marcosky as their expert witness, and informed the court that he would testify on the subject of accident reconstruction and that the "subject axle broke prior to the overturning of the GMC Jimmy, and caused the loss of control of the subject GMC Jimmy." Plaintiffs' Michigan counsel subsequently moved to withdraw from the case, stating that Marcosky would testify that the axle broke from impact rather than a defect. Thereafter, over the strenuous objection of plaintiffs' remaining counsel, Marcosky's deposition was taken by the defendants pursuant to court order, at which time he deposed that, from his examination of the damaged parts and materials furnished him, the axle broke as a result of impact during the vehicle's overturning. *338 In no uncertain terms he made it clear that the accident could not have happened as the plaintiffs claimed and there was no way in which his mind could be changed.
While plaintiffs had been unsuccessful in preventing the taking of Marcosky's deposition, plaintiffs' subsequently retained counsel by motion in limine succeeded in preventing the use of Marcosky's deposition as well as his testifying at trial. The sole basis for the circuit judge's ruling was that it would violate Rule 26(b)(4) of the Rules of Civil Procedure.
Defendants General Motors and Grenada Sales even sought an interlocutory appeal to this Court to determine the admissibility of this testimony, which was denied.
One can only assume from the majority's effrontery in approving exclusion of Marcosky's testimony that no one is going to read the law it cites.
First, the majority tells us that Marcosky's testimony was inadmissible under Rule 26(b)(4)(B) Miss.R.Civ.Proc. As any lawyer (or anyone else who reads its plain language) knows, Rule 26 deals only with a party's right to discover information from the opposing side prior to trial, not to trial testimony. Fenlon v. Thayer, 127 N.H. at 706, 506 A.2d at 321, 66 A.L.R. 4th at 208; Granger v. Wisner, 134 Ariz. 377, 381, 656 P.2d 1238, 1242 (1982); Rancourt v. Waterville Urban Renewal Authority, 223 A.2d 303, 305 (Maine 1966). The defense in this case sought to put a long since discovered witness on the witness stand at trial. What has that got to do with pretrial discovery?[1]
Second, Marcosky was not a secret, non-testifying expert as the majority baldly asserts. Plaintiffs had informed the defense and court he would appear as a witness and what his testimony would be. It was only after they discovered he would testify precisely opposite that they sought to transform him. Simply put, and as it plainly states, Rule 26(b)(4)(B) applies to instances when a lawyer engages specialists or experts to help him prepare his case. He has no intention that they testify in court, and their information has some confidentiality.[2]
Marcosky was not a non-testifying expert, but an announced plaintiffs' witness. The majority does not cite a single authority supporting the proposition that after a party has, by sworn answers to interrogatories (or in any other manner), announced to the court the name and proposed testimony of an expert or any other witness, he can later object to his testifying for the other side. In fact, courts hold that once trial starts, even those "non-testifying experts" employed solely to assist an attorney in trial preparation can be called as a witness by the opposing side. Fenlon v. Thayer; Granger v. Wisner; Cogdell v. Brown, 220 N.J. Super. 330, 531 A.2d 1379 (1987); Knoff v. American Crystal Sugar Co., 380 N.W.2d 313 (N.D. 1986); Rancourt v. Waterville Urban Renewal Authority; Wishom v. Ford Motor Co., 256 So.2d 298 (La. App. 1971); Pinkett v. Brittingham, 567 A.2d 858 (Del. 1990); Morris v. Maryland, 59 Md. App. 659, 477 A.2d 1206 (1981); Board of Education of South Sanpete, Etc. v. Barton, 617 P.2d 347 (Utah 1980). "No party to litigation has anything resembling a proprietary *339 right to any witness's evidence." Cogdell v. Brown, 531 A.2d at 1381.[3]
In Knoff the Nebraska Supreme Court noted that a trial court's refusal to permit one of these non-testifying experts from testifying for the opposing side "in effect suppressed an eyewitness." 380 N.W.2d at 320.

WELL, HOW ABOUT RULE 403?
After running into a dead-end on its conjectured Rule 26 violation, the majority in an after thought instructs us that, well, anyway, the circuit judge had the discretion to keep Marcosky from testifying under Rule 403 Miss.R.Evid. Majority Opinion, p. 314.
A brick wall stops the majority there as well. The record shows the circuit judge did not even hint at Rule 403 in his ruling rejecting Marcosky's testimony.
As Rules 401 and 402 Miss.R.Evid. make clear, all relevant evidence is admissible. Rule 403 states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.
As Foster v. State, 508 So.2d 1111, 1117 (Miss. 1987), and Williams v. State, 543 So.2d 665, 666-67 (Miss. 1989), clearly hold, the Rules favor admissibility of relevant evidence, and the circuit court under Rule 403 is never required to exclude relevant evidence, but he may exclude it in his discretion. Also, as these cases hold, before excluding any relevant testimony, the circuit judge must engage in a weighing process to see if the proffered evidence meets the test, and it is most certainly error to exclude it absent a weighing process under the rule. Under Rule 403, the trial judge is required to admit relevant evidence in the absence of making a specific record finding of his reason for refusing it. Hughes v. Tupelo Oil Co., Inc., 510 So.2d 502, 505 (Miss. 1987).
We do not engage in a weighing process in the first instance on this Court.
How can the majority write, "This Court will not `engage anew in the 403 balancing process,'" Majority Opinion, p. 314, when there was no circuit court balancing process to begin with?
Even accepting the proposition that we engage in a Rule 403 weighing ab initio on this Court, the absurdity does not stop there. Was Marcosky's testimony unfairly prejudicial, confusing the issues, or misleading, or a waste of time, factors the trial court can consider under Rule 403? Even the majority lacks the temerity to suggest this. It tells us "It added nothing new to the evidence presented and thus, would have been cumulative." Majority Opinion, p. 314.
Cumulative? Plaintiffs' counsel obviously did not think so. After successfully inducing the circuit judge to blatantly deny due process of law by prohibiting a competent disinterested witness from testifying, they proceeded to exacerbate the damage by chastising the defense for only producing Ed Reynolds and Jerry Chiddester, who had been employees of General Motors, as expert witnesses. Listen to plaintiffs' closing argument:
Dr. Reynolds and Dr. Chiddester are both GM career men, and I think it's worth it to say that. It's worth it to me to say it, for sure. That's a part of what you may consider. They worked for GM for most of their business lives. They still work for GM, ladies and gentlemen. They draw a check every month from GM. Most of their business, although they are retired, they get their business from GM. They have a vested interest in this case and in every GM case. They are GM guys. They are going to always find GM is doing right.
Vol. XXIV, 1995-1996.
This was terribly unfair argument. Fenlon v. Thayer, supra. It was at plaintiffs' counsel's behest General Motors had no other witness. One wonders if defense counsel *340 would have made such statements had Marcosky testified. Moreover, General Motors and Grenada Sales had every reason to expect an independent, disinterested trial witness for the defense until two months prior to trial when the circuit judge dynamited their strategy in ruling Marcosky could not testify.
Cumulative? In their brief counsel continue to berate the expert opinions of Chiddester and Reynolds as having been given by "long-term employees of GM at the time they `investigated' the subject accident." They were "biased witnesses." Appellees' Brief, p. 13.
Although Marcosky's conclusion that the accident did not occur as Jackson claimed was the same as Chiddester and Reynolds, his testimony was not a replication of theirs. He examined the damaged parts at a different time and under different circumstances than they, and he was clearly a witness who had no interest in the outcome of the lawsuit, except perhaps a sense of justice. Plaintiffs' counsel took full advantage of Marcosky's silence.
One must conclude that "cumulative evidence," like beauty, is in the eye of the beholder. It is outrageous for the majority to casually toss this gross error off as merely "cumulative."
It absolutely insults the intelligence to say, when all you have are interested witnesses, that a completely disinterested witness who says the same thing is cumulative.
The authorities flatly state that a party cannot go shopping for an expert, then announce the expert's opinion to the other side, and thereafter  upon learning that the expert is not going to testify as hoped  effect a metamorphosis and prevent the expert from testifying at trial. Wright and Graham, Federal Practice and Procedure § 5482, p. 274 (1986); 2 Weinstein's Evidence § 503(a)(3)(1), pp. 503-06 (1989).
I have taken no doubt unnecessary pains to demonstrate there is no  absolutely no  Federal or State statutory or Constitutional prohibition, or Rules of Procedure or Evidence impediment whatever to Marcosky's testimony. Rule 501 Miss.R.Evid. flatly states that in the absence of some such provision, "no person has a privilege to ... (4) Prevent another from being a witness."
Ignoring this rule as well, the majority is unfair, and has blatantly denied due process of law.
Any reflective reader will have difficulty avoiding a suspicion of cynicism behind the majority's publishing what it must know is rubbish. Can such a reader escape sensing a "we don't care if you believe it or not, take it or leave it," air about it, an effrontery of power?

THE SILENT MAJORITY
This contempt for anything other than reaching the result the majority has foreordained in this case is further evidenced by the majority not discussing, indeed not even mentioning, a host of remaining errors assigned on this appeal.
The remainder of this dissent is to enlighten the reader on at least some of them.

I. DOUBLE BARRELED ERROR
In opening statement plaintiffs' counsel proceeded to inform the jury that this was not the only time General Motors had failed to inspect and placed a defective axle on the market.
And, this is despite the fact, despite the fact, that eighteen axles from this type vehicle, identical to this axle, prior to the time of this accident in December, which we will be getting to in a minute, December the 14th of 1984, despite the fact eighteen accidents had happened with this type axle in it, where there was allegations it had fractured and broken.
You would have witnessed the fact that every one of those eighteen, as in this one, General Motors was like a bunch of magpies on a fence. "Impact fracture." "Impact fracture." "Impact fracture." (Emphasis added.)
There were prompt objections by counsel for General Motors and Grenada Sales, which were overruled. Vol. XVII, 449.
*341 Counsel did not stop there. When the defense was putting on its case, in cross-examination of Chiddester we read:
Q. Dr. Chiddester, you are aware, are you not, that prior to this accident date of December of 1984, General Motors had experience, had they not, or had knowledge of, or knew of, 18 other rear axles that had failed on these type vehicles? You are aware of that, aren't you? (Emphasis added.)
A. No, I'm not.
Q. And you are not aware of the fact then, sir, that General Motors took the position in every one of them they were single event impact fractures?
A. It doesn't surprise me. They probably were, because very few axles have failed otherwise.
Vol. XXIII, 1632.
Having made these grave charges that General Motors had eighteen times placed on the market vehicles with defective axles which broke in use, and subsequently telling a bald-faced lie about all of them, counsel most assuredly was under a duty to offer substantial proof of these charges.
They offered none. Instead, in a court of this State they first slandered the ability of General Motors to make a quality product and then slandered its character, and all with complete impunity.
At no time in trial did plaintiffs offer one word of evidence to substantiate these charges.
Unquestionably, it is reversible error for counsel in opening statement to allege facts which are either inadmissible as evidence, or which he knows he cannot prove. Gillson v. Gulf, Mobile and Ohio Railroad Co., 42 Ill.2d 193, 246 N.E.2d 269 (1969); Kester v. Bruns, 326 N.W.2d 279 (Iowa 1983); State v. Browner, 587 S.W.2d 948, 16 A.L.R. 4th 795 (Mo. 1979).
Unquestionably, it is reversible error to accuse or insinuate during cross-examination of the opposing party that he has committed other acts of misconduct, and then offer no proof of any of them. Hosford v. State, 525 So.2d 789 (Miss. 1988).
In Hosford we held that cross-examining an accused of other similar acts of misconduct in which the State offered no proof was outrageously unfair and reversible error. In this case the error was committed twice, both in opening statement and cross-examination of Chiddester. After throwing this polecat slander in the jury box, how could the jury ignore it?
Yet the majority sees nothing amiss in this slander of a company and its employees; they do not fare as well in our Court as a man accused of child sexual abuse. Indeed, the majority does not even see reason to mention this error.
It should also be pointed out that the circuit judge blatantly erred in the first place in overruling General Motors' motion in limine prior to trial to exclude evidence of other defective axles in the absence of some showing of a similarity of circumstances. Mitchem v. Illinois Central Gulf R. Co., 515 So.2d 852 (Miss. 1987); Parmes v. Illinois Central Gulf Railroad, 440 So.2d 261, 265 (Miss. 1983); Hartford Insurance Group v. Massey, 216 So.2d 415, 417 (Miss. 1968).
Even with the green light from the court, however, the best plaintiffs' counsel could do was make charges they never attempted to prove.

II. PATROLMAN DONALD BROWN
Brown was not an expert. He testified he looked at the accident scene, but his sole testimony on direct examination as to what he actually saw at the scene consisted of the following:
When I got to the scene of the accident, I noticed the female, the mother, sitting on the shoulder of the road with several people around her, and one was holding the baby at the time, when I got there, and I noticed the vehicle was next to the pond, which was on the, I guess, north side of the highway.
No measurements, no description of the physical scene were given. Then the following final question and answer:
Q. During the course of the time you were there investigating this accident, Patrolman Brown, did you find any evidence, *342 observe any evidence, of improper driving on the part of Linda Jackson?
Over objection he answered:
No. I did not.
(Vol. XVIII, 624).
This was highly improper because (1) Brown was no expert; (2) no factual predicate had been laid for him to express any opinion; and (3) it was a generalized question as to whether he had found "any evidence" of "improper driving."[4]Roberson v. State, 569 So.2d 691 (Miss. 1990); Rose v. State, 556 So.2d 728, 733 (Miss. 1990); Hughes v. Tupelo Oil Co., Inc.; Rucker v. Hopkins, 499 So.2d 766 (Miss. 1986); Swaggart v. Haney, 363 So.2d 251, 255 (Miss. 1978); Shivel v. Ferguson, 259 So.2d 123, 126 (Miss. 1972); Parmes v. Illinois Central Gulf Railroad.
Plaintiffs' counsel did not stop there. On cross-examination of Chiddester, General Motors expert, counsel asked:
Q. [D]id you take into consideration in formulating your opinion, that the police officer, Officer Brown, Investigator Patrolman Brown, who investigated the accident, was of the opinion there was no improper driving on the part of Linda Jackson? (Emphasis added.)
A. I believe he did say that.
Q. Did you take that into consideration in reaching your opinion?
A. I did not  I always take comments of that type into consideration, particularly early in an investigation, but I do my own investigation to determine what happened in an accident.
Plaintiffs' counsel were not through. Here is closing argument:
Then he [Brown] went on to say, "During the course of this time, did you find any evidence of any improper driving by Linda Jackson?" "No." (Emphasis added.)
Thus, the clear error in admitting this opinion was twice exacerbated by plaintiffs' counsel.

Even Worse
Even more egregious was the following testimony elicited from Brown:
Q. Did you have an opportunity to discuss with Linda Jackson how the accident occurred?
After objection had been overruled:
Q. What did she tell you?
A. That her rear left tire came off. The axle broke, in other words. (Emphasis added.)
Vol. XVIII, 662.
The self-serving declaration of Jackson as to how the accident occurred was incompetent. Swaggart v. Haney. No attempt was made to qualify it as an excited utterance under Rule 803(2) M.R.E. Evans v. State, 547 So.2d 38, 41 (Miss. 1989).
Brown's tacked-on gratuitous opinion as to what she meant by her statement was gross error.
Even if Brown's hearsay statement as to what Jackson told him had been competent evidence, there was absolutely no evidentiary authority for him to add one single word to the actual words he recalled her saying. Yet he proceeded to gratuitously embellish her statement on the very crux of this lawsuit by giving the jury his interpretation of what she meant.
Can anyone believe this actually happened in a court, all with complete impunity?
One would think this would have been enough for plaintiffs' counsel, but they were not through. In closing argument, after accurately quoting from the record as to other parts of Brown's testimony, here is what counsel told the jury Brown had testified:
He said, "In other words, she said the axle broke.... She said, "The axle broke." She didn't say, "I ran off the road and lost control. I don't know what happened. I can't believe I have done this. I can't believe I have done this to myself and my baby." She said, "The axle broke."
Vol. XXIV, 1993.
Jackson said no such thing. Here we have a highway patrolman adding to a simple hearsay statement something not said at all *343 by the declarant which went to the very heart of the case.
Even that was not enough for plaintiffs' counsel. In closing argument counsel brazenly misquoted and misrepresented Brown's testimony by telling the jury Jackson had actually told him there at the scene that the axle broke!
In courts of this State are witnesses to be permitted to gratuitously add to clear and simple hearsay statements what they think the declarant might have meant? Meanings that go to the very heart of a case? And are counsel to be permitted to brazenly misquote testimony?[5]

III. IMPROPER CONDUCT OF JUDGE

A. What Mitchell Testified
Juanita Sistrunk Mitchell, the first to arrive at the scene of the accident December 14, 1984, found Mrs. Jackson fully conscious "because she told us too many things." In describing how the accident occurred, Mrs. Jackson told her, "Well, suddenly, it seemed like I run into some real deep gravel and I had no control, or could not control the car." Vol. XXII, 1453-54.
Thereafter, when Chiddester was on the witness stand, and as a predicate to asking him an opinion, defense counsel asked him if he had heard Mrs. Mitchell's testimony. Plaintiffs' counsel objected, and defense counsel responded that Mitchell's testimony related to Mrs. Jackson "being off on the shoulder of the road." She obviously could not have "run into some real deep gravel" on the paved surface. Plaintiffs' counsel responded that all Mrs. Mitchell had testified was that "she said Linda Jackson described to her that when she felt the bump, that it felt like the left rear was off the road." (Emphasis added.) The record shows that Mitchell testified to no such thing. Yet the circuit judge commented: "That's what I remember her saying." (Emphasis added.)
Defense counsel then informed the court accurately what Mitchell had testified, and was in the process of asking Chiddester another question when the court interrupted:
BY THE COURT: Just a moment. We won't take Mr. Yerger's statement as necessary to being what the testimony was. You all know what the testimony was. You are the judges of the facts. If we are wrong and if I'm wrong, you are right on the facts. That's just the way it is. Now, my recollection as to the last part of that may not go along with Mr. Yerger's, but I am going to allow him to ask that question and let the jury remember what, in fact was said. (Emphasis added.)
Vol. XXIII, 1682-83.
The judge distorted the actual testimony. He had no business whatever telling the jury what he remembered, and in this case it was wrong.
The jury went into deliberations with a mental conflict. The circuit judge had flatly said that what in truth was accurate was inaccurate.

B. Davidson
Jack Henry Davidson lived at the scene of the accident. On cross-examination defense counsel handed him a photograph to identify. Davidson replied, "It's a westerly view of my driveway, mailbox and pond." Then the following:
Q. (BY MR. YERGER) Was that a view that existed as of the date of the accident?
A. Yes, sir.
BY MR. YERGER: I would like to offer this as an exhibit. It's already offered.
BY THE COURT: Just a moment. I need you to further limit that, because of the problems with the other ones. I want you to ask questions as to whether that's just a view, or does it have any significance as far as the surface. I want the jury to understand that this is not necessarily  as I understand it, that exhibit is not necessarily accurate as to the surface of the road.
BY MR. YERGER: Your Honor, we are offering it as to what it represents.

*344 BY THE COURT: I want you to qualify it with that witness, too.
Vol. XVIII, 608.
Again, the circuit judge injected himself into the case. For what purpose?

C. Conflict in Jackson's Testimony
When Mrs. Jackson deposition was taken, she was asked, "Do you know when you lost control of the vehicle, whether your vehicle was partially on the shoulder, or was it in the westbound lane?" She answered, "I don't have any knowledge." (Emphasis added.)
At trial she was asked on cross-examination, "Is your testimony that as you felt this bump, that  and the vehicle went out of control, is your testimony that you were in the lane of travel headed west at that time?" She answered, "When I felt the bump, yes. After that the vehicle went out of control, ..." (Emphasis added.) Vol. XVIII, 701.
Defense counsel then read her what she had testified in the deposition, as above related, and asked her if this was correct. She replied, "That's correct."
Plaintiffs' counsel then stated, "Your Honor, in all fairness, he needs to read the rest of it."
Then the court added:
BY THE COURT: Well, I don't see any inconsistency so far in the testimony today and the testimony then. Is there something I missed?
Vol. XVIII, 702.
The circuit judge found no inconsistency between not knowing whether or not the car was on the pavement and knowing it was when she lost control.[6]

D. Cheap Shot
The complaint was filed November 8, 1985. On December 19 a petition was filed to remove the action to the U.S. District Court for the Southern District of Mississippi, and with it an answer raising numerous defenses. The answer denied the axle was defective.
General Motors had not had the time or opportunity to examine the damaged vehicle prior to December 19, the date of filing its answer. It did examine the vehicle some time in 1986, and throughout trial maintained the axle was not defective. The denial in the answer was the position General Motors consistently maintained throughout.
On cross-examination Chiddester was asked:
Q. Why, sir, would General Motors file a formal answer in this case, without any investigation, denying that this axle failed in normal use?
BY MR. YERGER: Now, we object to that. That is a legal matter and not a matter involved in this particular area as to this expert. It's a matter that is a legal decision that is made, and is improper for him to go into that particular point as to why the answer was filed, of denial, and it speaks for itself.
Plaintiffs' counsel then argued that Chiddester was a representative of General Motors under Rule 30(b)(6). Defense counsel attempted to protest, but the court responded:
BY THE COURT: So what? Number one, I don't know what difference it would make, but number two, I don't necessarily see the direct relevance whatsoever. The question here is can they be impeached because this individual spoke as General Motors, and apparently, they are trying to get an inconsistent position taken by Mr. General Motors. (Emphasis added.)[7]
BY MR. YERGER: Your Honor, there has been no inconsistent position taken here. The position is 
BY THE COURT: That's your judgment. We will see whether the jury has a different judgment. Overruled. (Emphasis added.)
What is an attorney representing a defendant to do? He has a limited time to plead, *345 the due date of the answer frequently being  as here  before there has been an opportunity to get all the facts of the case. Yet, if he denies, even though his subsequent investigation proves the denial was completely accurate, his client can still be chastised in court for the attorney's filing a general denial prior to knowing all the facts.
The brazen unfairness of this can be seen by reversing the situation. Let us suppose that when Mr. or Mrs. (or both) Jackson were testifying, on cross-examination they had been asked why they alleged in their complaint that the axle broke before the Jimmy turned over when their own expert Marcosky said it did not? Suppose they had been further asked if it was not true that their court counsel were the third or fourth set of lawyers they had employed? And, finally, why was it that they would continue to solemnly allege the axle had broken before impact when they never got an expert to say so until six months before trial, and some three years after they had filed their lawsuit?
This was a very cheap shot by a lawyer who certainly knew better, and condoned by a judge who should have known better. Add to this the judge again injected himself into the case.[8]

E. Night-time Express
After ten full days of trial, the verdict was rendered at 10:45 at night on Memorial Day, when, according to the trial court itself, the jury was "worn-out." Vol. XXV, 2048.
In Isom v. State, 481 So.2d 820 (Miss. 1985), this Court reversed a jury verdict where the jury deliberated from 3:21 p.m. until 10:38 p.m. following a one and a half day trial. This Court stated:
The physical and mental stamina of the jury in particular, and the Court in addition, was taxed. Although judicial time and economy are of importance, the endurance of a jury requires consideration. This court suggests that this is excessive deliberation time. (Emphasis added.)
Id. at 824. See also Grimsley v. Tyner, 454 So.2d 482, 485 (Miss. 1984) ("requiring or permitting juries to deliberate on cases during such times may cause their verdicts to become suspect") (emphasis added); Parker v. State, 454 So.2d 910, 912 (Miss. 1984) (due process requires reasonable hours and circumstances); Edge v. State, 393 So.2d 1337 (Miss. 1981).
Here the jury was pressured under more extreme conditions. After saturation with complex facts and exhibits for ten days, on the final day, the Memorial Day holiday, the jury heard testimony from 9:00 in the morning until approximately 5:30 p.m., followed by extensive instructions and two hours' worth of closing arguments. This would have been a feat of endurance for a jury on any day. It was even more arduous because the jurors were being kept away from their families on Memorial Day, in a court house that was not air conditioned most of the afternoon. Vol. XXIV, 1981-82. Then, at 8:15 that night, eleven and three quarters hours after beginning the tenth day of trial, the jury was sent to the jury room to eat a meal and begin deliberations! The jury had to consider numerous photographs, exhibits, and instructions and make an informed decision before the next morning. At 10:45 that night, the jury returned verdicts totaling $7,150,000.
There was no reason for the jury to make such an important decision under these conditions. Vol. XXIV, 2049. The jurors should have been allowed to go home at 5:30 p.m., after all testimony was complete, and return Tuesday morning for jury instructions, closing arguments and deliberation. They would have been refreshed, more willing and better able to consider all the issues and evidence. *346 This is exactly what the defendants' attorneys suggested. Vol. XXIV, 1981. The trial court simply refused to listen.
A verdict an hour and fifteen minutes before midnight, fourteen hours into the tenth day of a complex trial in an un-air conditioned court house on Memorial Day, is clearly "suspect." Judicial time and economy do not warrant forcing a jury to make an important decision that way. Putting this case to the jury under these circumstances was reversible error, regardless of the verdict.

F. Treatment of Defense Witnesses
While Chiddester was being questioned on a treatise, the court stated, "He can answer, but what I just heard said can be a result of this type of thing." (Emphasis added.) (Injecting himself again.) Vol. XXIII, 1661. When Chiddester said, "I didn't say that, "the trial court responded, "I didn't say you did. That's what I just heard that the book said that." (Emphasis added.) Id. When Chiddester attempted to explain, trial court interrupted:
Just a moment. You wait until a question. You can say how it doesn't on Redirect, or when you are explaining. I'm not saying it does or doesn't. The jury doesn't need to misunderstand me. I'm not saying it does or does not say that. I'm saying they may infer that, and you may certainly may explain in your opinion why it does not say that. (Emphasis added.)
Vol. IX at 1661-62.
This comment clearly indicates the court's opinion of what the treatise stated, which opinion in fact was flat wrong. It effectively told the jury it could infer that the treatise supported plaintiffs; if it didn't draw that inference, the jury would be disagreeing with the court. This was unfair and usurped the jury's decision.
During General Motors' cross-examination of Marcus Dean Williams, the trial court stated:
I don't see the benefit of going over and asking him what those pictures show, when the pictures do speak for themselves... . that is not a valid purpose in Cross-Examination. Let's get to something that means something. It's not important to know how many pictures a witness can count. Ask him a question that matters in the trial of this case.

... .

What difference does it make? (Emphasis added.)
Vol. IV, 658-50.
Similarly, when plaintiffs' counsel objected that inspections and procedures performed at the Tonawanda Forge plant were not relevant, the trial court stated:

That is my inclination to feel the same way. I don't want to cut you off from anything you determine might be beneficial to the jury making its determination; however, time lost can never be regained, and everybody's time is important to them.
... .
You open up a whole world of rebuttal. We could start a brand-new case in rebuttal after we got through with this, about whether those are done correctly, and whether they are proper, or whether there are errors in those processes, is what you are doing.
... .

I don't see the value of it, but I am going to let you put on your case. (Emphasis added.)
Vol. IX, 1715-17.
This is like Mississippi Power Co. v. Harrison, 247 Miss. 400, 152 So.2d 892, 901 (1963), where this Court found prejudicial error in the trial court's comment that evidence "is not essential here. It is not material and will encumber the record to the extent there will be no end." (Emphasis added.) See Sivley v. Sivley, 96 Miss. 137, 51 So. 457, 458 (1910) (reversible error where trial court said evidence "did not amount to anything and did not have anything to do with the issue in this cause.").[9]

IV. REFUSED INSTRUCTION
Compounding the error of prohibiting Marcosky from testifying was the court's refusal of a requested defense instruction that the jury could infer from the plaintiffs' failure to use him that his testimony would be unfavorable to plaintiffs. The defense was entitled to some such instruction. Fruehauf *347 Corp. v. Trustees of First United Methodist Church, 387 So.2d 106, 112 (Miss. 1980).

V. RHOADES' TESTIMONY
A series of requests for admission were filed against General Motors, answered August 17, 1988. Number five and its answer reads:
REQUEST NO. 5: The fracture of the subject rear axle shaft and its failure were in part associated with an intergranular fracture mode.
ANSWER: Admitted.
This admission was a clerical mistake of General Motors' counsel. Counsel later moved to withdraw the admission, which was sustained by the court at a pretrial hearing. The court did rule, however, that the admission might be used for impeachment. Plaintiffs not having been misled or prejudiced by this erroneous admission, the court would have erred by overruling the motion. Smith v. First National Bank of Atlanta, 837 F.2d 1575 (11th Cir.1988); Farr Man & Co., Inc. v. M/Z of Rozita, 903 F.2d 871 (1st Cir.1990); American Auto. Assn. v. AAA Legal Clinic of Jefferson Crooke, P.C., 930 F.2d 1117 (5th Cir.Tex. 1991).
G.L. Rhoades, accident reconstructionist expert employed October 19, 1989, and sole expert making any semblance of a case against General Motors, testified that "Mrs. Jackson's axle marked by white paint by General Motors was defective by their own admission." (Emphasis added.) Of course, General Motors had not admitted any such thing. Following an objection and motion for mistrial, the following was elicited before the jury:
Q. BY MR. RAYBURN: Mr. Rhoades, when you were referring in number five to the axle being defective by General Motors' own admission, were you referring to the documentation that you have just showed to the jury?
A. I referred to the physical mark on the flange and the document produced by General Motors pursuant to your request. (Emphasis added.)
Vol. XVIII, 783.
Of course, this was especially harmful, because Rhoades was giving as one basis for a claim of defective axle that General Motors had admitted it. The jury could disregard the rest of Rhoades' opinion if it believed General Motors had admitted it manufactured a defective axle.
Unfortunately for General Motors, this was not the only number Rhoades did on it. In his exposition he stated, "Now, the General Motors people are going to tell you a version about the accident"  to which there was an objection, which was overruled. Rhoades proceeded to state, "General Motors has already told me a version of how this accident occurred, and I'm sorry but the U-bolts are bent in the wrong direction." Vol. XVI, 760. Three pages over in his continued exposition Rhoades again informed that jury that "General Motors told me they didn't know what happened here." (Emphasis added.) Again there was an objection, which was overruled in the following comment by the court: "If he is using what he has learned from the other side in his opinion, then he may do so, if that's the case. So go ahead." Vol. XVIII, 763.
Of course, General Motors had not "told" Rhoades anything. These comments were misleading and untruthful characterizations. This was prior to any General Motors expert taking the stand, and part of plaintiffs' case in chief.
Rhoades continued:
Excuse me, Your Honor. In other terminology, what I learned from listening to General Motors witnesses in this case was that they didn't know what made this mark after nearly four years. You know, I'm trying to figure that out. I'm looking at all these marks, had this tire at my disposal since November of '89, and I gave them opinions in this case and gave those to Mr. Yerger at the end of December of '89, and I'm trying to figure out who looked at this tire for four years and couldn't find these marks."
BY MR. YERGER: Your Honor, could we have a continuing objection to this, advocate? (Emphasis added.)

*348 BY THE COURT: Sustain that one. Sustained.
A. Now, if I could show you the photographs.
BY MR. YERGER: Your Honor, could we approach the Bench?
BY THE COURT: No, sir, not at this point. (Emphasis added.)
BY MR. YERGER: May we make 
BY THE COURT: You may make your motion from right there. Make any motion you have right there. It's just so 
BY MR. YERGER: Make motion for a mistrial.
BY THE COURT: Overruled.
Vol. XVIII, 763-64.
Why did the circuit judge never see any reason to admonish Rhoades, or instruct the jury to disregard his blatant advocacy?
On cross-examination Rhoades demonstrated his hostility by informing counsel, "You still don't understand. Let's go through it again." Vol. XIX, 813. Defense counsel then requested the court to instruct the witness "to answer the question and not say that the lawyer doesn't understand or make or make comments to the lawyer like he's the instructor." Vol. XIX, 813. The court did not admonish Rhoades, did not rule.
Rhoades finally told the jury that "my opinion goes further than a reasonable scientific and engineering probability and certainty ... I would guarantee that to Lloyds of London if I were an underwriter." Vol. XVIII, 785. The court did sustain an objection to this comment, but overruled a motion for a mistrial. Again no admonishment of Rhoades, or instruction to the jury to disregard his outrageous statements.
When defense counsel was questioning its own expert, Reynolds, on direct examination, the record reveals the court on its own repeatedly told the witness that he had already answered a question and to move on to another. Vol. XXIV, 1878-80.
The court's treatment of Rhoades needs to be compared with his treatment of Chiddester:
Q. BY MR. RAYBURN: I'm not talking about braking. I'm talking about when she came back on the road. You've got her off the road. You've got her coming back on the road doing 50 to 60 miles an hours, and you spent about two hours talking about coefficient of friction and everything else to this jury. I want you to tell this jury  well, let me just put it this way. The fact is, there is no physical evidence whatsoever of her coming off that road and her coming back up on that road, on that roadside, is there, Dr. Chiddester?
A. No, I wouldn't expect to find any. I don't understand your question. I don't understand your question. It doesn't make sense.
BY THE COURT: You cannot offer a comment 
A. I'm sorry.
BY THE COURT:  Dr. Chiddester. Save your apology until I'm through explaining to you. You don't offer a comment on whether the question is appropriate or not.
Vol. XXIII, 1651-52.
Again, when Chiddester was on cross-examination, he attempted to inform the court that he had not said what he understood the court said he had said, and when the court said that the book to which Chiddester had been asked to refer made the statement, again the witness attempted to correctly inform the court that "It doesn't say " the court interrupted him and told him to wait until he was asked a question. Chiddester was simply trying to correct a misstatement the judge had made which was an incorrect reading of a manual. Chiddester clearly knew what the manual said; the circuit judge obviously did not. The circuit judge had no business giving his interpretation of the manual *349 in the presence of the jury in the first place.[10]

* * *
The mind is numbed by the profusion and severity of errors in this case. I wish I could say that I have covered them all in this dissent, but regret to add that others remain.[11]
The unbelievable manner in which Brown and Rhoades were permitted to go beyond their function as witnesses, Brown bootstrapping plaintiffs' case and Rhoades slandering the defense, did they do this on their own volition? Or, was it part of the broader tactic demonstrated in counsel's unfair opening statement, the exclusion of Marcosky, counsel's unfair cross-examination of Chiddester, and counsel's unfair closing argument?
This was a trial of dirty tricks. I would reverse and I respectfully dissent.
SMITH, J., joins this dissent.
PRATHER, P.J., concurs in result only.

APPENDIX

REFUSAL TO ALLOW JOHN MARCOSKY TO TESTIFY AS A DEFENSE WITNESS
From the time the complaint was filed and the cause went to trial, plaintiffs changed lawyers and experts. The complaint was filed November 8, 1986, by Cliff Finch, attorney of Batesville, and Harry M. Philo, of the law firm of Philo, Atkinson, Steinberg, White, Vigliotti and Keenan of Detroit, Michigan. On October 8, 1987, Stanley L. White of the Detroit firm responded to GM's motion to compel answers to interrogatories to the plaintiffs. On November 21, 1987, White supplemented plaintiffs' answer to interrogatories, and named as their designated expert David Felbeck, a professor at the University of Michigan. Answers to interrogatories also stated that Roy Wilcox, a professor at Auburn University, had examined the axle.
Cliff Finch died, and the law firm of Bagley, Bailey and Henning of Batesville appeared as Mississippi counsel for the plaintiffs in White's answers to interrogatories February 3, 1988.
On July 15, 1988, White again supplemented plaintiffs' answers to interrogatories, named John Marcosky of Southfield, Michigan, as plaintiffs' expert to testify in the trial of the case, stating that he would testify as an accident reconstructionist and that the axle broke prior to the GMC Jimmy overturning. Vol. III, 390.
On April 25, 1989, the Philo firm moved to withdraw as counsel, White advising the court that the reason he was withdrawing as counsel for plaintiffs was because Marcosky's opinion was that the axle shaft fracture was caused by impact rather than a defect. Clerk's Papers, Vol. III, 480. On May 9, 1988, there was an order permitting the Philo firm to withdraw as counsel.[1]
The defense sought to depose Marcosky, and plaintiffs moved for a protective order. The circuit judge denied the motion. Clerk's Papers, III, 519. In his deposition taken June 12, 1989, Marcosky clearly and unequivocally gave as his opinion that the axle broke because of an impact during the rollover of the vehicle. Excerpts of Marcosky's deposition follow:
A... . After a review of that material, I wanted to inspect any other parts which they had of the vehicle, and he [Dr. Felbeck] indicated that the wheel-tire assembly was available, and so we went out and looked at that, and 
Q. What did you find when you saw the wheel-tire assembly?

*350 A. Well, the thing that stands out in my mind concerning that inspection was that upon examination of the wheel and tire assembly, the mounting flange for the wheel was deformed and that's the flange which mounts to the axle assembly.
Q. How was it deformed?
A. As if a torsional load was placed across the axle, essentially along the longitudinal axis of the axle shaft or a bending load which would be applied through the tire-rim assembly to bend the axle.
Q. Can you tell us in layman's terms what this means?
A. Well, it means that the rim has been bent at the mounting flange, and in order to do that, a load has to be applied to the wheel to cause this deformation, and this can happen in several ways and examine each way and see what effect it might have on the axle shaft and the performance of the vehicle if it is bent.
Q. Can you take this sheet of paper and just roughly sketch the components that you examined and their relation to each other?
A. Sure.
Q. Would you do so?
A. Yes.
... .
A. What I did was resolve this inspection in the presence of Dr. Felbeck and Mr. White was to explain to them how the flange can be bent.
Q. How can a flange be bent?
A. It has to be bent by a force applied to some part of the circumference, partial circumference, of the tire-rim assembly, which is met with a resistive force of the axle shaft.
I indicated to them that this could occur by sliding into a curb, into some depressed area which would put a [side] force on the tire-rim assembly, some object that would impart a lateral force or side force on the tire-rim assembly. That can include several dynamics of the vehicle during a collision or an accident sequence, but I indicated to them that the only way that you can bend a flange is if it's attached to something which offers resistive force such as the axle shaft, and that if the axle shaft is fractured prior to any force applied to the wheel-tire assembly, you can't bend the flange.
So I examined with them the types of forces that would be encountered in cornering or in turning maneuvers on the roadway, and I indicated to them that the forces during normal driving would not be sufficient to bend the flange and, therefore, understanding the amount of deformation that was experienced in this flange, I indicated to them that sliding into a curb or hitting a curb or some object to bend the rim at the mounting flange would prohibit the operation of the vehicle on the roadway because the tire would just wobble so much that you couldn't drive it.
Therefore, the only other way that this flange could be bent was during the rollover sequence where the axle was still attached to the flange, still attached to the rest of the axle into the axle housing and the differential assembly, and that a force is applied to the side of the rim causing it to be deformed and subsequently, fracturing the axle shaft.
That's the explanation and the scenario we went through in the analysis of how the flange could be bent.
... .
Q. (BY MR. SMITH) Do you have an opinion as to the point in the accident that the axle shaft actually fractured?
A. Yes.
Q. What is that opinion?

*351 A. Well, it was during the roll sequence and it would be where the left rear wheel would come in contact with the road surface during a rollover and with the vehicle attitude such that the rear of the vehicle would be pitched down or the front of the vehicle would be pitched up.
... .
Q. Do you have an opinion as to the cause of the fracture of the axle shaft in the vehicle that is the subject of this litigation?
A. Yes, sir.
Q. What is that opinion?
A. The axle shaft fractured during the roll sequence when the vehicle apparently was airborne and contact was made to the left rear tire and the road surface resulting in deformation to the rim assembly and fracture of the axle shaft.
Q. Mr. Marcosky, is this the opinion that you gave Mr. Stan White?
A. Yes, sir, it is.
Q. Is this the opinion that you gave Dr. Felbeck?
A. Yes, sir.
Q. At the time you gave this opinion to Mr. Stan White, the counsel for the plaintiff at that time, were you under his employ?
A. Yes, sir.
... .
A. The deformed section I saw was the flange of the wheel rim and it would  I will draw a little sketch over here. It would kind of take an attitude like this. It would be bent in this manner, so you would get a moment in it like this created by this force down here. This is a force, so it would put a moment or a bending force into the axle like that, and, of course, if your axle comes out here like that, you can see it's going to fracture at this location right here.
Q. Would you note "fracture" there?
A. All right.
... .
A. I am not going to change my opinion because the facts scientifically and from a mechanical engineer's and a vehicle dynamics point of view only can give you one conclusion.
... .
Q. And is that basically the reason that you didn't charge them for your work on this particular case?
A. No, not at all. I didn't charge them because I thought that this situation should have been discovered early. My time was just a few hours at the inspection, plus reviewing it, and I just said: Stan, just forget about it. I think if I would have seen this very early on, it would have been been [sic] over within an hour.
Q. What do you mean "it would have been over in an hour"?
A. Once I would have seen the evidence, I would have just said: Stan, there is no case here, and I don't think he would have proceeded. I just didn't feel justified in charging him for something which to me was so obvious. (Emphasis added.)
Plaintiffs obtained other attorneys and employed new expert witnesses, and on January 17, 1990, plaintiffs moved to preclude Marcosky from testifying at trial. The court granted the motion March 2, 1990. Although *352 Marcosky had been listed by plaintiffs as the expert who was expected to testify at trial, the court ruled that he was a non-testifying expert under Rule 26(b)(4)(B), Miss.R.Civ. Proc., and would not be called as a witness by the opposing party. Vol. VIII, 1460.
Following this ruling both General Motors and Grenada Sales moved for a Rule 5(a) Miss.S.Ct. interlocutory appeal. This also was denied by the March 12, 1990, order of the circuit court. General Motors and Grenada Sales on March 26, 1990, filed a joint petition for an interlocutory appeal with this Court to determine whether Marcosky should be permitted to testify. We denied the petition per curiam May 9, 1990.
In the pre-trial order GM and Grenada Sales both listed Marcosky as a witness who would be called live or by deposition.
In the pre-trial conference May 9, 1990, the deposition of Marcosky was offered for identification, marked, and made a part of the record. The circuit judge ruled that he would not allow the deposition or live testimony of Marcosky.
During trial, Vol. XXIV, 1832, General Motors made a proffer of the deposition testimony on file with the court, by deposition or live. The court stated that its previous ruling would stand.
The court also refused proffered instruction D-40 which would have permitted the jury to draw an adverse inference from plaintiffs' failure to call Marcosky as an expert.
Plaintiffs in closing argument attacked the credibility of GM's experts, Reynolds and Chiddester, because they were not independent experts, but employees and consultants of GM:
Dr. Reynolds and Dr. Chiddester are both GM career men, and I think it's worth it to say that. It's worth it to me to say it, for sure. That's a part of what you consider. They worked for GM for most of their business lives. They still work for GM, ladies and gentlemen. They draw a check every month from GM. Most of their business, although they are retired, they get their business from GM. They have a vested interest in this case and in every GM case. They are GM guys. They are going to always find GM is doing right.
On appeal plaintiffs' counsel remind us that Reynolds and Chiddester were "long term employees of GM at the time the `investigated' the subject accident," that Reynolds was a GM "stockholder," and these were "biased witnesses." Plaintiffs' Brief, p. 13.

ON APPELLANT'S MOTION TO STAY MANDATE PENDING APPLICATION FOR WRIT OF CERTIORARI
SMITH, Justice, concurring in part, dissenting in part to order:
I agree with the majority order granting a stay of this Court's mandate, but disagree to limit the time to thirty (30) days.
As set forth in my original dissent, the facts of this case belie the Jacksons' theory of the cause of the accident and overwhelmingly support General Motors' theory. There are serious constitutional issues raised concerning equal protection and denial of due process.
*353 The size of this record and the sheer complexity of the issues raised certainly demonstrate "good cause" under Miss. Supreme Court Rule 41 and should require more time for General Motors to prepare its petition.
This was a patently unfair and constitutionally infirm trial. As an example, I ask this question:
Does our Constitution permit any court in this land under some court rule, or pretext thereof, to deny a litigant his right to have a duly summoned witness such as John Marcosky, testify to critically material, non-privileged facts in a contested lawsuit? The United States Supreme Court has the opportunity to so declare by denying certiorari in this case.
I respectfully dissent and would grant a sixty (60) day stay of this Court's mandate as requested by General Motors.
CONCURRING IN PART, DISSENTING IN PART TO ORDER ISSUED 5/13/94.
HAWKINS, C.J., joins this opinion.
LEE, P.J., joins in part.
NOTES
[1] The Court, sitting en banc, denied as moot General Motors' motion to allow Justices Roberts and Smith to participate in this case, pursuant to Supreme Court Internal Operating Rules. The Mississippi Manufacturer's Association's petition to file briefs as amicus curiae was denied as too little too late.
[1] Case depth  the hardened surface layer of case-hardened iron or steel [a ~ of 0.040 inch]. Webster Third New World International Dictionary. Copyright 1971.
[2] Quench crack  cracks derived from the process of hardening of a ferrous alloy induced by rapid cooling from a temperature above the transformation range. Webster Third New World International Dictionary. Copyright 1971.
[3] Law of Gravitation  a statement in physics; any particle in the universe attracts any other particle with a force that is proportional to the product of the masses of the two particles and inversely proportional to the square of the distance between them. Websters Third New World International Dictionary. Copyright 1971.
[4] Law of Motion  a statement in dynamics: a body at rest remains at rest and a body in motion remains in uniform motion in a straight line unless acted upon by an external force  called also Newton's first law of motion. Websters Third New World International Dictionary. Copyright 1971.
[1] Rancourt v. Waterville Urban Renewal Authority, 223 A.2d at 305 states:

Rule 26(b) is neither limited by nor does it limit, the admissibility of evidence at trial. No new privilege operative to keep otherwise admissible evidence from the Court and jury was thereby created. The Rule was designed to regulate the discovery and deposition process before the trial and as a part thereof to protect a party against the necessity of disclosing the "work product", so-called... .
The expert under Rule 26(b) is not thereby taken from the witness stand. He remains a live person, available to give testimony in particular to give his informed opinion. The fact that the opinion was obtained at the expense of the defendant and for its information and use only, does not force the conclusion that the expert may not testify from the stand at the request of the opposing party without the consent of his employer.
The opinion of the expert is a fact which the fact finders may be entitled to know. The cry of "privilege" does not stop the Court and jury from hearing the opinion of the expert in the search for the truth.
[2] Rule 26(b)(4)(B) applies only to an expert "who is not expected to be called as a witness at trial."
[3] Without further lengthening this dissent, 66 A.L.R. 4th 223-224 lists decisions from 25 states holding that a litigant can compel the testimony of an expert initially retained by the opposing party.
[4] This was about like asking him, "In your opinion do you believe she was a good driver?"
[5] We invite the reader's attention to what the majority has to say about this error.
[6] We invite the reader's attention to what the majority has to say about this error.
[7] Note the circuit judge's reference to Mr. General Motors. Was it a sneer? The record, of course, cannot show us.
[8] We invite the reader's attention to what the majority has to say about this error.
[9] We invite the reader's attention to what the majority has to say about this error.
[10] We invite the reader's attention to what the majority has to say about this error.
[11] E.g., the hocus pocus video demonstration by Rhoades of how the accident happened is itself a war story for the books. Justice Smith's dissent, pp. 322-23.
[1] Plaintiffs became dissatisfied with the representation of Bailey as well, and employed Thomas Jones of the Liston law firm in Winona. Jones was not representing plaintiffs at trial, however.